UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

OMAR WESLEY,
by next friend Brenda Wesley,

Case No. 2:19-cv-00918

Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES,
INC., MAUREEN WHITE, PH.D., DEBORAH
MAYO, APNP, EVANSTON INSURANCE
COMPANY, MOBILE MEDICAL SPECIALISTS
LLC, DEF-1 INSURANCE COMPANY, ABC-1
COMPANY, DEF-2 INSURANCE COMPANY,
KIM WOLF, APNP, DEF-3 INSURANCE
COMPANY, MILWAUKEE COUNTY,
WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION, WISCONSIN COMMUNITY
SERVICES, INC., DEF-4 INSURANCE
COMPANY, TEWANA MARSHALL, JOHN
COOK, MICHAEL EWING, M.D., MEDPRO
GROUP INC., NICHOLAS WINTERGERST,
INJURED PATIENTS AND FAMILIES
COMPENSATION FUND, and JOHN DOES
ONE THROUGH TEN,

Defendants.

## COMPLAINT

Plaintiff Omar Wesley, by next friend Brenda Wesley, by their attorneys,

the law firm of Gingras Cates & Wachs LLP, by Attorneys Mark L. Thomsen

and William F. Sulton, and the law firm of Mastantuono & Coffee SC, by Attorney Craig A. Mastantuono, alleges the following:

## Introduction

1.    This lawsuit is filed to redress egregious decisions made by each Defendant who denied life changing medication to a seriously mentally ill citizen and the significant injuries and damages that were caused as a result.

2.    The Courts have long recognized that persons in the custody of municipalities are constitutionally guaranteed adequate medical care and treatment.  It well established that this constitutional guarantee extends to persons on supervised release.

3.    Schizophrenia is among the most devastating diseases affecting mankind.  Clozapine is the only antipsychotic medication that has shown an anti-craving effect for drugs of abuse, a significant effect in reducing suicide rates in patients with schizophrenia, and an efficacy on refractory mood disorders.  In short, clozapine is the most effective atypical antipsychotic and has the most profound metabolic side effects.

4.    It is well known in the field of mental health that clozapine is prescribed for difficult to treat schizoaffective and similar disorders.  It is also well known that once clozapine has been shown to be effective, clozapine must not be abruptly discontinued.  And it is well known that upon an abrupt discontinuation of clozapine, clozapine must be re-prescribed, and the patient closely monitored in a safe environment.

5.     Plaintiff Omar Wesley has a long, documented history of severe schizoaffective disorder that was impossible to manage with any other medication.  Each Defendant knew Plaintiff Omar Wesley would rapidly decompensate without clozapine.  Each Defendant knew that Plaintiff Omar Wesley was not provided with clozapine.  And each Defendant knew that with each passing day Plaintiff Omar Wesley's permanent mental state would decline.

6.     When Defendants learned that Plaintiff Omar Wesley had not been provided with clozapine, each responded by blaming him for the decompensation that each caused.  Plaintiff Omar Wesley decompensated and was imprisoned as a result of the Defendants' unlawful conduct, whether deliberately indifferent or otherwise.  Plaintiff Omar Wesley's life has been permanently altered and halted a successful transition into the community and caused in further confinement which continues today and into the foreseeable future.

## Jurisdiction and Venue

7.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367(a).

8.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside and have their principal place of businesses in the Eastern District of Wisconsin, Plaintiff was incarcerated within the Eastern District of Wisconsin, and Defendants' actions and omissions

leading to denial of Plaintiff's rights occurred within the Eastern District of Wisconsin.

<strong>Parties</strong>

**A.     Plaintiff**

9.      Omar Wesley ("Wesley"), by next friend Brenda Wesley, was confined at the Milwaukee County Criminal Justice Facility ("CJF") in June, July and August of 2016.  Wesley suffers from severe mental health conditions that require psychiatric medication management.

**B.     Defendants**

10.     Armor Correctional Health Services, Inc. ("Armor") contracted with the Milwaukee County Sheriff's Office to provide constitutionally required care to persons confined at CJF.  Pursuant to its contract, Armor agreed to be solely responsible for all medical care decisions and services, including decisions and services related to mental health patients, like Wesley.  Armor's registered agent is C T Corporation System whose address is 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703.  Armor's principal office is located at 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155.  At all times relevant to Wesley's claims, Armor was acting under color of law and within the scope of its contact with Milwaukee County.

11.     Evanston Insurance Company ("Evanston") is an insurance business that issued a policy of insurance to Armor and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made

to satisfy the judgment. Evanston's principal office is located at 10 Parkway N, Suite 100, Deerfield, IL 60015. The policy of insurance was in effect during the times of Wesley's claims. Evanston is a proper party to the action pursuant to Wis. Stat. § 803.04.

12. Maureen White, Ph.D. ("Dr. White") is the former Mental Health Director of CJF. Dr. White was employed by Armor. Dr. White created the policies and procedures for mental health patients, like Wesley, at CJF. At all times relevant to Wesley's claims, Dr. White was not a licensed psychologist. At all times relevant to Wesley's claims, Dr. White was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, Dr. White was acting under color law and within the scope of her employment with Armor.

13. Deborah Mayo ("Mayo"), APNP, is a nurse practitioner and was employed by Armor at CJF. Mayo was responsible for providing psychiatric medication management to Wesley. At all times relevant to Wesley's claims, Mayo was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, Mayo was acting under color law and within the scope of her employment with Armor.

14.     John Does One, Two, Three, Four, and Five are current or former physicians and nurse practitioners who worked for Armor (or who worked for a company that contracted with Armor) at CJF who failed to fill Wesley's prescription for clozapine, failed to provide Wesley with clozapine or caused those failures.  At all times relevant to Wesley's claims, John Does One through Five were aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.  At all times relevant to Wesley's claims, the John Does were acting under color law and within the scope of their employment with Armor.

15.     Mobile Medical Specialists LLC ("MMS") contracted with Armor to provide psychiatric medical management for Wesley.  MMS's registered agent is Scott Stollenwerk whose address is 347 Park Avenue, Pewaukee, Wisconsin 53072.  MMS's principal office is located at 347 Park Avenue, Pewaukee, Wisconsin 53072.  At all times relevant to Wesley's claims, MMS was acting under color of law and within the scope of its contract with Armor and/or Milwaukee County.

16.     DEF-1 Insurance Company ("DEF-1") is an insurance business that issued a policy of insurance to MMS and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment.  The policy of insurance was in effect during the times of

Wesley's claims. DEF-1 is a proper party to the action pursuant to Wis. Stat. § 803.04.

17. ABC-1 Company ("ABC-1") contracted with Armor to provide psychiatric medical management for Wesley. At all times relevant to Wesley's claims, ABC-1 was acting under color of law and within the scope of its contract with Armor and/or Milwaukee County.

18. DEF-2 Insurance Company ("DEF-2") is an insurance business that issued a policy of insurance to ABC-1 and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment. The policy of insurance was in effect during the times of Wesley's claims. DEF-2 is a proper party to the action pursuant to Wis. Stat. § 803.04.

19. Kim Wolf ("Wolf"), APNP, is a nurse practitioner and was employed by MMS. Wolf was responsible for providing psychiatric medical management to Wesley. At all times relevant to Wesley's claims, Wolf was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, Wolf was acting under color law and within the scope of her employment with MMS, Armor and/or ABC Defendants.

20. DEF-3 Insurance Company ("DEF-3") is an insurance business that issued a policy of insurance to Wolf and is liable to satisfy all or part of a

judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment. The policy of insurance was in effect during the times of Wesley's claims. DEF-3 is a proper party to the action pursuant to Wis. Stat. § 803.04.

21. The Milwaukee County Sheriff's Office ("MSCO") is responsible for the operations and management of CJF. Pursuant to Wis. Stat. § 302.336(2), "Prisoners confined in the county jail [][] are in the legal custody of the county sheriff or other keeper of the jail." Pursuant to § 302.336(2), "The sheriff or other keeper is legally responsible for any such prisoner's confinement; maintenance; care, including medical and hospital care. . . ." Pursuant to Wis. Admin. Code § DOC 350.14(1), "The sheriff shall provide or secure necessary medical and mental health treatment and emergency dental care for inmates in custody." At all times relevant to Wesley's claims, Milwaukee County was acting under color of law.

22. Wisconsin County Mutual Insurance Corporation ("WCMIC") is an insurance business that issued a policy of insurance to Milwaukee County and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment. WCMIC's principal office is located at 18550 West Capitol Drive, Brookfield, WI 53045. The policy of insurance was in effect during the times of Wesley's claims. WCMIC is a proper party to the action pursuant to Wis. Stat. § 803.04.

23.     John Does Six, Seven, Eight, Nine and Ten are current or former employees of MSCO who placed Wesley in solitary confinement because of his severe mental illness or caused Wesley to be placed in solitary confinement. At all times relevant to Wesley's claims, John Does Six through Ten were aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, the John Does were acting under color law and within the scope of their employment with Milwaukee County.

24.     Wisconsin Community Services, Inc. ("WCS") contracts with the Milwaukee County Department of Health & Human Services ("MCDH&H") to provide supervision services of persons, like Wesley, who are out of confinement and in the community. WCS's registered agent is Clarence Johnson whose address is 3732 West Wisconsin Avenue, Suite 320, Milwaukee, Wisconsin 53208. WCS's principal office is located at 3732 West Wisconsin Avenue, Suite 320, Milwaukee, Wisconsin 53208. At all times relevant to Wesley's claims, WCS was acting under color of law and within the scope of its contract with Milwaukee County.

25.     DEF-4 Insurance Company ("DEF-4") is an insurance business that issued a policy of insurance to WCS and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment. The policy of insurance was in effect during the times of

Wesley's claims. DEF-4 is a proper party to the action pursuant to Wis. Stat. § 803.04.

26. Tewana Marshall ("Marshall") was employed by WCS as a supervision agent. Marshall was assigned to supervise Wesley in June and July 2016. At all times relevant to Wesley's claims, Marshall was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, Marshall was acting under color law and within the scope of her employment with WCS.

27. John Cook ("Cook") was employed by WCS as a supervision agent. Cook was assigned to supervise Wesley in June and July 2016. At all times relevant to Wesley's claims, Cook was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, Cook was acting under color law and within the scope of his employment with WCS.

28. Michael Ewing, M.D. ("Dr. Ewing") is a psychiatrist employed by WCS. Dr. Ewing evaluated Wesley in June and July of 2016. At all times relevant to Wesley's claims, Ewing was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's

decompensation as result.  At all times relevant to Wesley's claims, Dr. Ewing was acting under color law and within the scope of his employment with WCS.

29.     MedPro Group Inc., together with its operating subsidiary The Medical Protective Company, Inc. (collectively "MedPro") is an insurance business that issued a policy of insurance (Policy Number 617922) to Dr. Ewing and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment.  MedPro's registered agent is C T Corporation System who is located at 301 S Bedford Street, Suite 1, Madison, WI 53703.  MedPro's principal office is located 5814 Reed Road, Fort Wayne, IN 46835.  The policy of insurance was in effect during the times of Wesley's claims.  MedPro is a proper party to the action pursuant to Wis. Stat. § 803.04.

30.     Nicholas Wintergerst ("Wintergerst") is a probation and parole agent for the Wisconsin Department of Corrections ("DOC").  Wintergerst was assigned to supervise Wesley in June and July of 2016.  At all times relevant to Wesley's claims, Wintergerst was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.  At all times relevant to Wesley's claims, Wintergerst was acting under color law and within the scope of his employment with DOC.

31.     Suzanne Williams ("Williams") is a conditional release specialist for the Department of Health Services ("DHS").  Williams was assigned to supervise

Wesley in June and July of 2016. At all times relevant to Wesley's claims, Williams was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result. At all times relevant to Wesley's claims, Williams was acting under color law and within the scope of her employment with DHS.

32. Injured Patients and Families Compensation Fund ("Fund") is a mandatory health care liability risk sharing plan created by Chapter 655 of the Wisconsin Statutes and established under Wis. Stat. § 619.04 whose obligations and responsibilities include making payments in excess of underlying insurance limits on behalf of negligent health care providers, as that term is defined by Wis. Stat. § 655.002, in the State of Wisconsin, including, without limitation, Dr. Ewing. The Fund has its administrative offices at 125 South Webster Street, Madison, WI 53702, and is a proper party to this action pursuant to Wis. Stat. § 655.27(5)(a)1.

## Factual Allegations

33. From June 2015 to February 2016, Wesley was confined at the Mental Health Complex in Milwaukee County. Wesley was diagnosed with schizoaffective disorder, antisocial personality disorder and cocaine abuse.

34. Schizoaffective disorder is a chronic mental health condition characterized by symptoms of schizophrenia, such as hallucinations or delusions, and symptoms of mood disorder, such as mania and depression. Wesley

experienced hallucinations (e.g., seeing or hearing things that are not there), delusions (false, fixed believes that are held regardless of contradictory evidence), disorganized thinking, depressed mood, and maniac behavior.

35. Wesley was prescribed lithium, benztropine and clozapine for his conditions. Wesley's prescription for clozapine for schizophrenia began on December 1, 2015. Clozapine is generally prescribed as a last resort, after all other available medication regimens have failed. Clozapine is the only medication that has worked for Wesley.

36. Milwaukee County has CJF which is operated by the Sheriff and a House of Correction ("HOC") which is operated by a Superintendent. Since 2001, Milwaukee County has been under a court order to improve medical services to inmates at both facilities. The responsibility for medical care is under the direction of the Superintendent of HOC for both facilities. Armor began providing inmate medical services in May 2013 and provided inmate medical services at all times relevant to the events at issue. The Superintendent of HOC was tasked with monitoring Armor's performance.

37. On February 23, 2016, Wesley was moved to HOC after it was determined he was competent as a result of the clozapine.

38. In April 2016, Armor made the decision to move Wesley to CJF. He did not return to the Mental Health Complex or HOC.

39.     The Circuit Court for Milwaukee County, the Honorable William S. Pocan ("Judge Pocan") presiding, entered an order for an assessment to determine whether Wesley could be supervised in the community.

40.     Pursuant to its contract with MCDH&H, WCS agreed to perform the assessment.  WCS assigned Marshall to assess Wesley.

41.     On June 6, 2016, the circuit court determined that Wesley should be supervised in the community.  Wesley remained at CJF.

42.     On June 17, 2016, Armor faxed Wesley's lists of medications and prescriptions, including clozapine, to WCS.  The lists showed that Wesley's prescription for clozapine would end on June 24, 2016.

43.     On June 20, 2016, Marshall created a supervision plan for Wesley. Marshall did not, however, review Wesley's psychiatric medication management records.

44.     Mayo, Armor, Wolf and MMS failed to obtain a prescription for clozapine after June 24, 2016.  As a result, Wesley was deprived of his mandatory clozapine.

45.     Marshall was aware, by at least June 20, 2016, that Wesley was diagnosed with schizoaffective disorder, antisocial personality disorder and cocaine abuse.  Marshall was aware, by at least June 20, 2016, that Wesley was prescribed lithium, benztropine and clozapine.

46.     Wintergerst met with Wesley on June 24, 2016, and reviewed Wesley's prescriptions and knew that clozapine should have been made available

to Wesley. Wintergerst knew Wesley would decompensate without the medication.

47. Wintergerst and Marshall spoke about Wesley's medications, including clozapine, on June 24, 2016, and did nothing.

48. Pursuant to its contract with MCDH&H, WCS agreed to supervise Wesley. WCS assigned Marshall to supervise Wesley. On June 28, 2016, Wesley was released to Marshall. Marshall did not, however, review Wesley's prescription history from CJF prior to picking him up.

49. Upon picking up Wesley, Marshall received a list of Wesley's current prescriptions. Marshall was aware that the list did not include clozapine—even though clozapine was specifically identified in her own care plan created by at least June 20, 2016. As a result, Wesley was further deprived of clozapine.

50. Marshall took Wesley to the Hills of Love Adult Family Home ("AFH") where he was placed for community supervision.

51. Wesley's community supervision team was Marshall, Cook, Williams and Wintergerst. By at least June 29, 2016, Marshall, Cook, Williams and Wintergerst noticed increased symptoms of mental illness and delusional thinking.

52. By at least June 29, 2016, Marshall spoke with Dr. White about the wrongful discontinuation of Wesley's prescription for clozapine. Dr. White told

Marshall that Armor's failure to enter information on a website caused the prescription for clozapine to lapse.

53.     On June 29, 2019, Marshall told Wintergerst, Cook and Williams that Wesley's prescription for clozapine had wrongly lapsed.  They knew that Wesley needed to take clozapine on a daily basis.  They knew that Wesley would decompensate without the medication.  They knew they were observing Wesley's decompensation.

54.     Wintergerst met with Wesley on June 29, 2016.  Wintergerst discussed Wesley's psychiatric medication management and noted that Wesley was acting strangely.

55.     On June 30, 2016, Wesley was evaluated by Dr. Ewing.  Dr. Ewing reviewed Wesley's medical records and was aware that Wesley had not taken clozapine since June 24, 2016.  Dr. Ewing failed to prescribe clozapine to Wesley on June 30, 2016.  Dr. Ewing knew that Wesley would decompensate without clozapine.

56.     On July 3, 2016, Wesley left AFH for six hours.  It was the only time Wesley left the AFH.

57.     On July 6, 2016, Wesley meet with Marshall and was drug tested for illicit or nonprescribed controlled substances.  The test confirmed that Wesley had not taken any illicit or nonprescribed controlled substances.

58.     On July 7, 2016, Marshall, Wintergerst, Cook and Williams discussed Wesley's decompensation and psychiatric medication management.

59.     On July 8, 2016, a prescription for clozapine was filled for Wesley. Wesley took the medication and became severely ill.

60.     Wesley did not take clozapine on July 9, 2016 because he was severely ill, due to the worsening of his condition resulting from the cessation of clozapine that began at the jail.

61.     Despite his worsening conditions, Wesley agreed to take clozapine on July 10, 11, 12 and 13 of 2016.

62.     Due to a collective staffing decision of Marshall, Cook, Williams and Wintergerst, on July 13, 2016, Wesley was arrested and was taken to CJF for missing doses of clozapine.  When Wesley arrived at CJF he had clozapine with him.  Inexplicably, one or more John Does prohibited Wesley from keeping and taking his required clozapine.

63.     Mayo ordered clozapine for Wesley on July 13, 2016.  The clozapine was available to given to Wesley on July 14, 2016.  However, Mayo, Armor, Wolf, MMS, Dr. White and John Does Six through Ten failed to provide clozapine to Wesley from July 14 through July 20 of 2016.  Wesley experienced physical pain and suffering, in addition to emotional pain, suffering, inconvenience, mental anguish, and loss of freedom and enjoyment of life because of his decompensation due to no medication management for his serious mental illness.

64.     John Does Six through Ten placed Wesley in solitary confinement because he was symptomatic as a result of Defendants abrupt discontinuation of clozapine.

65.     CJF has a policy and practice of confining inmates suffering from acute mental disorders, like Wesley, to disciplinary cells.

66.     CJF has a policy and practice of not providing medication to inmates suffering from acute medical disorders, like Wesley, in disciplinary cells.

67.     Judge Pocan held a hearing on August 9, 2016, during which he concluded that "[c]learly the jail erred" because "we know [][] the medicine was unavailable to him four days prior to the release" and "the jail created this situation."     (Hr'g Tr. at 35:3-14, Aug. 9, 2016.)   During the same hearing, Assistant District Attorney Tyrone St. Junior concluded, "I don't think it's fair or ethical to hold a person who needs medication responsible for something when they haven't gotten the medication and it's not their fault." (Hr'g Tr. at 36:8-11.) Judge Pocan also concluded that "[t]his was an error made by the jail that . . . in effect set Mr. Wesley up for failure." (Hr'g Tr. at 40:12-16.)

## Claims for Relief

### A.     Section 1983 Claims

68.     Wesley incorporates here all other paragraphs in this complaint.

69.     Defendants were acting under color of state law at all times relevant to Wesley's claims.

70. Mayo, Wolf and John Does One through Five were deliberately indifferent to Wesley's acute mental illness when they failed to provide clozapine to Wesley on and after June 25, 2016.

71. Marshall was deliberately indifferent to Wesley's acute mental illness when she failed to take Wesley to a hospital for monitoring and provide clozapine to Wesley on and after June 28, 2016.

72. Wintergerst, Cook and Williams were deliberately indifferent to Wesley's acute mental illness when they failed to take Wesley to a hospital for monitoring and provide clozapine to Wesley on and after June 29, 2016.

73. Dr. Ewing was deliberately indifferent to Wesley's acute mental illness when he failed to take Wesley to a hospital for monitoring and provide clozapine to Wesley on and after June 30, 2016.

74. Dr. White, Mayo, Wolf and John Does One through Five were deliberately indifferent to Wesley's acute mental illness when they failed to monitor Wesley and provide clozapine to Wesley on and after July 14, 2016.

75. John Does Six through Ten were deliberately indifferent to Wesley's acute mental illness when they failed to monitor Wesley and provide clozapine to Wesley on and after July 14, 2016.

76. Wesley has been injured and will likely suffer future injury, as a result of Defendants' denial of constitutionally required care in violation of the Eighth and Fourteenth Amendments, giving rise to Wesley's claims for relief under 42 U.S.C. § 1983.

**B.    Monell Claims**

77.    Wesley incorporates here all other paragraphs in this complaint.

78.    Milwaukee County and Armor's policy and practice of confining inmates suffering from acute mental disorders, like Wesley, to disciplinary cells is deliberately indifferent to those inmates' acute medical conditions and deprives them of constitutionally adequate care.

79.    Milwaukee County and Armor's policy and practice of not providing medication to inmates suffering from acute medical disorders, like Wesley, in disciplinary cells is deliberately indifferent to those inmates' acute medical conditions and deprives them of constitutionally adequate care.

80.    Dr. White was employed by Armor as the Mental Health Director and, therefore, was directly responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Wesley.

81.    Dr. White had policymaking authority over mental health policies and procedures at CJF and was responsible for ensuring that the policies and practices of Armor complied with federal and state requirements for the treatment of persons confined at CJF.

82.    Dr. White had personal knowledge of the de facto policy and practice of confining inmates suffering from acute mental disorders, like Wesley, to disciplinary cells and of not providing medications to those inmates.

83.    Dr. White had personal knowledge that Armor failed to provide clozapine to Wesley on and after June 24, 2016.

84.     Dr. White had personal knowledge that Wesley was not receiving clozapine between July 14 and 20 of 2016.

85.     Wesley has been injured and will likely suffer future injury, as a result of Defendants' denial of constitutionally required care in violation of the Eighth and Fourteenth Amendments, giving rise to Wesley's claims for relief under 42 U.S.C. § 1983.

### C.     Negligence Claims

86.     Wesley incorporates here all other paragraphs in this complaint.

87.     Defendants undertook and owed to Wesley the duty to make reasonable efforts to care for him in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves.

88.     Notwithstanding the aforementioned duties, Defendants treated Wesley in a manner that was extremely negligent, careless, reckless and without concern for his safety.

89.     That Defendants, in the face of Wesley's obvious need for medical attention and assistance, failed to obtain medical attention, failed to identify a medical emergency, and/or failed to act as required.

90.     Wesley was a patient of Dr. White, Mayo, Wolf, Dr. Ewing and John Does One through Five at all times material hereto, including, but not limited to at all times material hereto.

91.     Dr. White, Mayo, Wolf, Dr. Ewing and John Does One through Five had a duty to provide medical care to Wesley at all times material hereto, which duty required them to use the degree of care, skill and judgment usually exercised by a reasonable healthcare provider in the same or similar circumstances.

92.     Dr. White, Mayo, Wolf, Dr. Ewing and John Does One through Five were negligent in their care and treatment of Wesley at all times material hereto, including as set forth above, in that they failed to possess/exercise that degree of care, skill and judgment usually exercised by a mental health professional, in that they, among other things, failed to monitor Wesley's decompensation and failed to make clozapine available to him as was required.

93.     Armor, MMS and WCS through its agents, servants and/or employees, including any individual, acting with real or apparent authority of Armor, MMS and WCS and/or any individual over whom they had supervisory control and responsibility with respect to medical care provided to patients had a duty to provide appropriate medical care to Wesley, at all times material hereto, which duty required Armor, MMS and WCS, their agents, servants and/or employees, including any individual acting with real or apparent authority of Armor, MMS and WCS and/or any individual over whom they had supervisory control and responsibility with respect to medical care provided to patients to possess/exercise that degree of care, skill and judgment usually exercised by a reasonable mental health care provider and its agents, servants and/or

employees in the same or similar circumstances; and were negligent in their care and treatment of Wesley at all times material hereto, in that among others, Armor, MMS and WCS failed to possess/exercise that degree of care, skill and judgment usually exercised by a reasonable healthcare provider in the same or similar circumstances, in that it, among other things, negligently treated Wesley's acute mental illness and was otherwise negligent.

94.    That the Defendants' negligence as alleged herein was a cause of Wesley's injuries and losses, and as a result of Defendants' negligence, Wesley sustained permanent severe injuries, including past and future pain, suffering, disability, emotional and mental distress, loss of freedom and enjoyment of life, past and future medical expenses; and all damages allowed under Wisconsin law, all to the damage to her in an amount to be determined at a trial of this matter.  In addition, as a result of Defendants' negligence, Wesley has been determined to be incompetent and is confined in a mental health center indefinitely, and likely for rest of his life.

D.    **Disability Discrimination Claims**

95.    Wesley incorporates here all other paragraphs in this complaint.

96.    Title II (42 U.S.C. §§ 12131-12134) and Section 504 of the Rehabilitation Act of 1973 ("Section 504") (29 U.S.C. § 794) prohibit disability-based discrimination by each Defendant, including the denial of opportunities to benefit from services, the failure to reasonably modify policies and procedures,

and imposing methods of administration that have the effect of discrimination on the basis of duality.

97.     Title II applies to public entities, which include state and local government, and their departments and agencies, such as Milwaukee County, CJF, Armor and WCS.   Section 504 applies to programs and activities of recipients of federal financial assistance.   Milwaukee County operates supervised release programs and activities and receives federal financial assistance.

98.     Congress enacted the ADA nearly 25 years ago "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, [and] independent living" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to . . . pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(7), (8).

99.     Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

100.   Congress enacted the ADA to broaden the coverage of the Rehabilitation Act of 1973, which similarly prohibits discrimination against individuals with disabilities by recipients of federal financial assistance. 29 U.S.C. § 794.

101.   Section 504 similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a).

102.   Title II covers essentially everything state and local governments and their agencies do.  *See Pa. Dept. of Corrs. v. Yeskey*, 524 U.S. 206, 209-12 (1998) (discussing the breadth of Title II's coverage).  Section 504 also applies to all of the activities of agencies that are federally funded and as a general rule violation of Section 504 also constitute violations of Title II.

103.   A "program or activity" is defined under Section 504 to include "all of the operations of a department, agency, . . . or other instrumentality of a State or of a local government" and "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b)(1)(A), (B). As such, all operations of a state government agency are covered by Section 504 if any part of it receives federal financial assistance.

104. Under these regulations, covered entities may not directly, contractually, or through other arrangements "deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i); see also 45 C.F.R. § 84.4(b)(1)(i). Covered entities also may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii); see also 45 C.F.R. § 84.4(b)(1)(ii).

105. Covered entities may not "utilize criteria or methods of administration "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability [or] that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i), (ii); see also 45 C.F.R. § 84.4(b)(4)(i), (ii).

106. In addition to these prohibitions, covered entities must take certain steps to avoid discrimination on the basis of disability. In particular, covered entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(7); see also 45 C.F.R. § 84.4(a); U.S. Dep't of Justice, Title II Technical Assistance Manual § II-6.1000, Illustration 2

(1993) (explaining that public entities may need to make modifications to programs such as individualized assistance to permit individuals with disabilities to benefit).

107.  This includes a prohibition on making custody decisions on the basis of generalized assumptions about disability, relegating those on supervised release with disabilities to lesser services and opportunities, imposing overprotective or unnecessarily restrictive rules, and failing to reasonably modify policies, practices, and procedures.  42 U.S.C. § 12101(a)(5).

108.  Defendants have repeatedly and continuously denied Wesley the opportunity to participate in and benefit from services, programs, and activities, and has otherwise subjected him to discrimination in violation of Title II. 42 U.S.C. § 12132.

109.  Defendants have also violated Section 504. 29 U.S.C. § 794(a). Defendants failed to individually analyze Wesley to determine what services and supports were appropriate for him in an effort to prevent Wesley's further decompensation and incarceration. Defendants also failed to (1) implement appropriate services when they learned of failure to provide clozapine; (2) identify appropriate service plan tasks; (3) assist Wesley in meeting service plan tasks to achieve normalcy; and (4) impose only necessary and legitimate safety requirements.

110.  Defendants have violated their obligations under Title II and Section 504 by (1) denying Wesley equal opportunities to participate in and

benefit from its services, programs, and activities, 28 C.F.R. § 35.130(a), (b)(1)(i)-(ii); 45 C.F.R. § 84.4(a), (b)(1)(i)-(ii); (2) utilizing criteria and methods of administration having the effect of discriminating against Wesley on the basis of disability and defeating or substantially impairing accomplishment of the objectives of its reunification program with respect to Wesley, 28 C.F.R. § 35.130(b)(3); 45 C.F.R. § 84.4(b)(3); and (3) failing to reasonably modify its policies, practices, and procedures where necessary to avoid discriminating against Wesley on the basis of her disability, 28 C.F.R. § 35.130(b)(7).

111. Wesley has been injured and will likely suffer future injury, as a result of Defendants' violations of Title II and Section 504.

## Relief Requested

112. Wherefore, Wesley respectfully requests that the Court enter judgment for him and against each defendant, jointly and severally, together with pre- and post-judgment interest, and grant the following relief:

    a. Award Wesley compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of freedom and enjoyment of life, and other nonpecuniary losses.

    b. Award Wesley damages for physical pain and suffering.

    c. Award Wesley punitive damages.

    d. Award Wesley's costs incurred in pursuing this action.

    e. Award Wesley's attorneys' fees incurred in pursuing this action.

    f. Award Wesley's experts' fees incurred in pursuing this action.

g. Grant such other and further relief as the Court may deem just and proper.

## Demand for Trial by Jury

113. Wesley hereby demands a trial by jury pursuant Fed. R. Civ. P. 38(b)(1) and the Seventh Amendment to the U.S. Constitution.

Dated at the law offices of Gingras Cates & Wachs LLP and Mastantuono & Coffee SC in Milwaukee, Wisconsin, on this 21st day of June, 2019.

*/s/ Mark L. Thomsen*
MARK L. THOMSEN (SBN 1018839)

*/s/ William F. Sulton*
WILLIAM F. SULTON (SBN 1070600)

Gingras Cates & Wachs LLP
Suite 330
219 N Milwaukee Street
Milwaukee, WI 53202
414-778-0700
mthomsen@gcwlawyers.com
wsulton@gcwlawyers.com

*/s/ Craig A. Mastantuono*
CRAIG A. MASTANTUONO (SBN 1020125)

Mastantuono & Coffee SC
Suite 5B
219 N Milwaukee Street
Milwaukee, WI 53202
414-276-8662
cmast@cmrc-law.com

*Attorneys for Plaintiff Omar Wesley*