UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

OMAR WESLEY,
by next friend Brenda Wesley,

                                   Case No. 2:19-cv-00918-LA

              Plaintiff,

       v.

ARMOR CORRECTIONAL HEALTH
SERVICES, INC., MAUREEN WHITE, KIM
WOLF, DEBORAH MAYO, COURTNEY
HOLIFIELD, KAYLA MCCULLOUGH,
MILWAUKEE COUNTY, NANCY EVANS,
KEVIN NYKLEWICZ, WISCONSIN
COMMUNITY SERVICES, INC., TEWANA
MARSHALL, JOHN COOK, MICHAEL EWING,
SUZANNE WILLIAMS, WISCONSIN COUNTY
MUTUAL INSURANCE CORPORATION,
EVANSTON INSURANCE COMPANY,
BARTON & ASSOCIATES, INC., THE
MEDICAL PROTECTIVE COMPANY, INC.,
INJURED PATIENTS AND FAMILY
COMPENSATION FUND, and WEST BEND
MUTUAL INSURANCE COMPANY,

              Defendants.

---

## FIRST AMENDED COMPLAINT
## BY PLAINTIFF OMAR WESLEY

---

NOW COMES Plaintiff Omar Wesley, by next friend Brenda Wesley, by

their attorneys, the law firm of GINGRAS, THOMSEN & WACHS, LLP, by Attorneys

Mark L. Thomsen and William F. Sulton, and the law firm of MASTANTUONO & COFFEE, S.C., by Attorney Craig A. Mastantuono, and alleges the following:

## I. **Introduction**

1. Omar Wesley ("Wesley") suffers from severe schizoaffective disorder.

2. Schizoaffective disorder is among the most devastating diseases affecting mankind.

3. Clozapine (or Clozaril) is the only antipsychotic medication that has shown an anti-craving effect for drugs of abuse, a significant effect in reducing suicide rates in patients with schizophrenia, and an efficacy on refractory mood disorders.

4. In February 2016, as a result of the clozapine regimen, Wesley was restored to mental competency by doctors at Mendota Mental Health Institute ("Mendota") following an earlier period of active psychosis rendering Wesley incapable of understanding pending court case proceedings or assisting his attorney, otherwise known as basic competency.

5. As a result of the medication shift, Wesley was transferred to the Milwaukee County House of Correction on February 23, 2016 and later the Milwaukee County Jail while he went through a four-month court process to resolve a pending criminal case from an incident occurring in November 2013.

6. On May 12, 2016 Milwaukee County Circuit Judge William Pocan found Wesley Not Guilty by Reason of Mental Disease or Defect ("NGI") of the

alleged crime and held that he could be safely monitored in the community on a conditional release commitment order, ready to lead a fuller life.

7. During that critical time of planned and approved reentry to the community, February 23, 2016 to August 10, 2016, Defendants failed to ensure that Wesley received the medication regimen at the Milwaukee County Jail, particularly the psychotropic medication clozapine, and caused Wesley to lose his competency.

8. As a result, he fell back to a state of active psychosis and remains at Mendota today, as yet unable to return to the competent and safe state he presented to the Milwaukee County Circuit Court in 2016.

9. CaryAnne Adriano, an Armor employee, registered nurse and night supervisor at the Milwaukee County Jail, admitted during her deposition that psychotropic medications were unavailable on a "daily" basis, during the time period Wesley was in the jail:

> Q. Okay. Were there times at which you were the night shift supervisor that patients on 4C did not get their medication because it was unavailable?
> **A. Yes.**
> Q. How often was that?
> **A. That would happen a lot.**
> Q. What do you mean by a lot?
> **A. Daily.**
> Q. You're aware that the patients on 4C are patients that suffer from mental illness?
> **A. Yes.**
> Q. And many of those patients have prescriptions for psychotropic medication?
> **A. Yes.**

Q. And it's your testimony that on a daily basis, these patients would not get their psychotropic medication because it was unavailable?

. . .

**A. Yes.**

10.     As alleged herein, Armor and Milwaukee County were deliberately indifferent to serious medical needs of mental health patients by failing, on a daily basis, to make psychotropic medications available.

11.     Armor and Milwaukee County's conduct is part of a custom, policy and practice of inadequate medical care and treatment to mental health patients, as reflected by their conduct both before and after Wesley's incarcerations at the Milwaukee County Jail and House of Correction.

12.     Armor and Milwaukee County's custom, policy and practice of unconstitutional care is reflected in their recent conduct as well.

13.     They refuse even basic accountability having failed to fire or even discipline *anyone* responsible for the daily unavailability of psychotropic medications.

14.     Armor and Milwaukee County permitted and encouraged a culture of unconstitutional care that was so rampant that Maureen White, Ph.D. an Armor employee and the Director of Mental Health at the Milwaukee County Jail and House of Corrections, unabashedly testified that she had no responsibility to ensure *any* medical care or treatment for mental health patients and described her role as "customer service."

15.    Omar Wesley brings this action seeking both accountability for the profound loss of his permanent mental state resulting in his continued institutionalization to this day rather than the healthy community release for which he had been prepared, and to ensure that the unconstitutional customs, policies and practices that caused his decline are eradicated from Milwaukee County and thus ceasing untold harm to others.

## II.  Jurisdiction and Venue

16.    This Court has jurisdiction over Wesley's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367(a).

17.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside and have their principal place of businesses in the Eastern District of Wisconsin, Wesley was incarcerated within the Eastern District of Wisconsin, and Defendants' actions and omissions leading to denial of Wesley's constitutional rights occurred within the Eastern District of Wisconsin.

## III.  Parties

### A. Plaintiff

18.    Omar Wesley suffers from severe mental health conditions that require psychiatric medication management.

19.    Wesley was transferred from Mendota to the Milwaukee County House of Corrections on February 23, 2016 after he was restored to competency

on the medication regimen clozapine, benztropine and lithium carbonate and was to be released into the community with continuing the medication.

20.     Wesley was a mental health patient at the Milwaukee County House of Corrections from February 23, 2016 to April 6, 2016.

21.     Wesley was a mental health patient at the Milwaukee County Jail (or Criminal Justice Facility) from April 6, 2016 to June 28, 2016 and from July 13, 2016 to August 10, 2016.

22.     Wesley was released to the custody and care of Wisconsin Community Services, Inc. from June 28, 2016 to July 13, 2016.

**B. Defendants**

**(i)     Armor Defendants**

23.     Armor Correctional Health Services, Inc. ("Armor") contracted with the Milwaukee County Sheriff's Office to provide constitutionally required medical care and treatment to persons confined at the Milwaukee County Jail (or Criminal Justice Facility) and House of Correction.  Pursuant to its contract, Armor agreed to be solely responsible for all medical care decisions and services, including decisions and services related to mental health patients, like Wesley. Armor's registered agent is C T Corporation System whose address is 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703.  Armor's principal office is located at 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155.  At all times relevant to Wesley's claims, Armor was acting under color of law and within the scope of its contract with Milwaukee County.

24.     Maureen White, Ph.D. ("Dr. White") was the Director of Mental Health, employed by Armor, working at the Milwaukee County Jail and House of Correction.

25.     Dr. White was responsible for the oversight and supervision of mental health staff, including psychiatrists, nurse practitioners, psych social workers and case managers.

26.     At all times relevant to Wesley's claims, Dr. White was aware of or deliberately indifferent to the daily or weekly lapses in psychotropic medications for mental health patients at the Milwaukee County Jail and House of Correction and was specifically aware of lapses in Wesley's clozapine.

27.     At all times relevant to Wesley's claims, Dr. White was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription to ensure continued competency, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

28.     Dr. White failed to undertake any reasonable steps to correct the daily or weekly lapses in psychotropic medications and failed to discipline any employee for allowing Wesley to miss his medication.

29.     At all times relevant to Wesley's claims, Dr. White was acting under color law and within the scope of her employment with Armor.

30.     Dr. White created the policies or ratified the practices of the mental health staff at the Milwaukee County Jail and House of Correction; these policies

and practices determined and affected care for inmate patients, including Omar Wesley.

31.    Dr. White is being sued both in her official capacity as the Director of Mental Health and individually.

32.    Kim Wolf ("Wolf"), APNP, is a nurse practitioner, employed by Armor, working at the Milwaukee County House of Correction.

33.    Wolf was responsible for providing psychiatric medication management to Wesley.

34.    At all times relevant to Wesley's claims, Wolf was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

35.    At all times relevant to Wesley's claims, Wolf was acting under color law and within the scope of her employment with Armor.

36.    Deborah Mayo ("Mayo"), APNP, is a nurse practitioner and contracted with Armor to provide constitutionally required medical care and treatment to persons confined at the Milwaukee County Jail.

37.    Mayo was responsible for providing psychiatric medication management to Wesley.

38.    At all times relevant to Wesley's claims, Mayo was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the

prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

39.     At all times relevant to Wesley's claims, Mayo was acting under color law and within the scope of her employment with Armor.

40.     Courtney Holifield ("Holifield") was the Director of Nursing, employed by Armor, working at the Milwaukee County Jail.

41.     Holifield was responsible for the oversight and supervision of nursing staff; these policies and practices determined and affected care for inmate patients, including Omar Wesley.

42.     At all times relevant to Wesley's claims, Holifield was aware of the daily or weekly lapses in psychotropic medications for mental health patients at the Milwaukee County Jail and was specifically aware of lapses in Wesley's clozapine.

43.     At all times relevant to Wesley's claims, Holifield was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

44.     Holifield failed to undertake any reasonable steps to correct the daily or weekly lapses in psychotropic medications.

45.     At all times relevant to Wesley's claims, Holifield was acting under color law and within the scope of her employment with Armor.

46.     Holifield created the policies or ratified the practices of nursing staff at the Milwaukee County Jail.

47.     Holifield is being sued both in her official capacity as the Director of Nursing and individually.

48.     Kayla McCullough ("McCullough") was the Health Services Administrator, employed by Armor, and responsible for the oversight and supervision of all of Armor's employees.

49.     At all times relevant to Wesley's claims, McCullough was aware of the daily or weekly lapses in psychotropic medications for mental health patients at the Milwaukee County Jail and House of Correction and was specifically aware of lapses in Wesley's clozapine.

50.     McCullough failed to undertake any reasonable steps to correct the daily or weekly lapses in psychotropic medications and failed to discipline any employee.

51.     At all times relevant to Wesley's claims, McCullough was acting under color law and within the scope of her employment with Armor.

52.     McCullough created the policies or ratified the practices of Dr. White, Holifield, and their subordinates; these policies and practices determined and affected care for inmate patients, including Omar Wesley.

53.     McCullough is being sued both in her official capacity as the Health Services Administrator and individually.

### (ii) Milwaukee County Defendants

54. Milwaukee County is a municipality organized under the laws of the State of Wisconsin, is a "person" subject to suit under 42 U.S.C. § 1983 and has a nondelegable duty to provide adequate medical care and treatment to persons confined in the Milwaukee County Jail and House of Correction.

55. The Milwaukee County Sheriff's Office ("MSCO") is responsible for the operations and management of the Milwaukee County Jail. Pursuant to Wis. Stat. § 302.336(2), "Prisoners confined in the county jail [][] are in the legal custody of the county sheriff or other keeper of the jail."

56. Pursuant to § 302.336(2), "The sheriff or other keeper is legally responsible for any such prisoner's confinement; maintenance; care, including medical and hospital care. . . ." Pursuant to Wis. Admin. Code § DOC 350.14(1), "The sheriff shall provide or secure necessary medical and mental health treatment and emergency dental care for inmates in custody."

57. At all times relevant to Wesley's claims, Milwaukee County was acting under color of law.

58. Nancy Evans ("Maj. Evans") was the commander of the Milwaukee County Jail and, by delegation, created the policies or ratified the practices at issue in this case; these policies and practices determined and affected care for inmate patients, including Omar Wesley.

59.     Maj. Evans was responsible for ensuring that the policies and practices of the jail comply with federal and state requirements for the treatment of detainees.

60.     Maj. Evans had personal knowledge of the policy, practice, and widespread custom of providing inadequate medical care at the jail.

61.     Maj. Evans is being sued in her official capacity.

62.     Kevin Nyklewicz ("Dep. Insp. Nyklewicz") was the deputy commander of the Milwaukee County Jail and, by delegation, created the policies or ratified the practices at issues in this case; these policies and practices determined and affected care for inmate patients, including Omar Wesley.

63.     Dep. Insp. Nyklewicz was responsible for ensuring that the policies and practices of the jail comply with federal and state requirements for the treatment of detainees.

64.     Dep. Insp. Nyklewicz had personal knowledge of the policy, practice, and widespread custom of providing inadequate medical care at the jail.

65.     Dep. Insp. Nyklewicz is being sued in his official capacity.

**(iii)   WCS Defendants**

66.     Wisconsin Community Services, Inc. ("WCS") contracts with the Wisconsin Department of Health Services to provide case management services to persons found NGI and deemed appropriate for  conditional release, like Wesley, pursuant to Wis. Stat. § 971.17 3)(d).  WCS's registered agent is Clarence Johnson whose address is 3732 West Wisconsin Avenue, Suite 320, Milwaukee,

Wisconsin 53208. WCS's principal office is located at 3732 West Wisconsin Avenue, Suite 320, Milwaukee, Wisconsin 53208. At all times relevant to Wesley's claims, WCS was acting under color of law and within the scope of its contract with DHS.

67. On May 19, 2016 WCS initiated services for Wesley, he was ruled NGI of an alleged crime by a Milwaukee County Circuit Judge and was deemed not dangerous and therefore appropriate for conditional release under Wis. Stat. § 971.17 3)(d).

68. Tewana Marshall ("Marshall") was employed by WCS as a case manager for persons on conditional release.

69. Marshall created the NGI conditional release plan for Wesley and was Wesley's case manager between June and August of 2016.

70. At all times relevant to Wesley's claims, Marshall was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

71. At all times relevant to Wesley's claims, Marshall was acting under color law and within the scope of her employment with WCS.

72. John Cook ("Cook") was employed by WCS as an Assistant Program Director for persons on NGI conditional release.

73. Cook approved the NGI conditional release plan for Wesley and supervised Marshall's case managing of Wesley.

74.     At all times relevant to Wesley's claims, Cook was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

75.     At all times relevant to Wesley's claims, Cook was acting under color law and within the scope of his employment with WCS.

76.     Michael Ewing, M.D. ("Dr. Ewing") was employed by WCS as a psychiatrist for persons on conditional release.

77.     Dr. Ewing made medical decisions concerning the care and treatment of Wesley from June 30, 2016 to August 11, 2016.

78.     At all times relevant to Wesley's claims, Dr. Ewing was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

79.     At all times relevant to Wesley's claims, Dr. Ewing was acting under color law and within the scope of his employment with WCS.

**(iv)   State Defendant**

80.     Suzanne Williams ("Williams") was employed by Department of Health Services ("DHS") as the contract manager for case management services for persons on NGI conditional release.

81.     Williams was the final decisionmaker for and approved the NGI conditional release plan for Wesley.

82.     Williams was also the final decisionmaker for and approved the unlawful jailing Wesley, in violation of the Equal Protection Clause, between July 13, 2016 and August 10, 2016.

83.     At all times relevant to Wesley's claims, Williams was aware of Wesley's prescription for clozapine, the necessity for keeping Wesley current on the prescription, the consequences of an abrupt discontinuation of the prescription, and Wesley's decompensation as result.

84.     At all times relevant to Wesley's claims, Williams was acting under color law and within the scope of her employment with DHS.

85.     Williams ratified Marshall's, Cook's and WCS's conduct.

86.     Williams is being sued in her individual capacity.

**(v)     Insurance Defendants**

87.     Wisconsin County Mutual Insurance Corporation ("WCMIC") is an insurance business that issued a policy of insurance to Milwaukee County and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment.  WCMIC's principal office is located at 18550 West Capitol Drive, Brookfield, WI 53045.  The policy of insurance was in effect during the times of Wesley's claims.  WCMIC is a proper party to the action pursuant to Wis. Stat. § 803.04.

88.     Evanston Insurance Company ("Evanston") is an insurance business that issued a policy of insurance to Barton & Associates, Inc., on which Mayo is an additional insured, and is liable to satisfy all or part of a judgment in this

action or to indemnify or reimburse for payment made to satisfy the judgment. Evanston's principal office is located at 10 Parkway N, Suite 100, Deerfield, IL 60015. The policy of insurance was in effect during the times of Wesley's claims. Evanston is a proper party to the action pursuant to Wis. Stat. § 803.04.

89. Barton & Associates, Inc. ("Barton") is a medical staffing company that placed Mayo with Armor at the Milwaukee County Jail. On belief, Barton's insurance policy requires Barton to be a named party to this action. Barton's registered agent in Wisconsin is National Registered Agents, Inc. located at 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703. Barton's principal office is located at 300 Jubilee Drive, Peabody, Massachusetts 01960.

90. The Medical Protective Company, Inc. ("MedPro") is an insurance business that issued a policy of insurance (Policy Number 617922) to Dr. Ewing and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment. MedPro's registered agent is C T Corporation System who is located at 301 S Bedford Street, Suite 1, Madison, WI 53703. MedPro's principal office is located 5814 Reed Road, Fort Wayne, IN 46835. The policy of insurance was in effect during the times of Wesley's claims. MedPro is a proper party to the action pursuant to Wis. Stat. § 803.04.

91. Injured Patients and Families Compensation Fund ("Fund") is a mandatory health care liability risk sharing plan created by Chapter 655 of the Wisconsin Statutes and established under Wis. Stat. § 619.04 whose obligations

and responsibilities include making payments in excess of underlying insurance limits on behalf of negligent health care providers, as that term is defined by Wis. Stat. § 655.002, in the State of Wisconsin, including, without limitation, Dr. Ewing.  The Fund has its administrative offices at 125 South Webster Street, Madison, WI 53702, and is a proper party to this action pursuant to Wis. Stat. § 655.27(5)(a)1.

92.    West Bend Mutual Insurance Company ("West Bend") is an insurance business that issued a policy of insurance to WCS and is liable to satisfy all or part of a judgment in this action or to indemnify or reimburse for payment made to satisfy the judgment.  West Bend's principal office is located at 1900 South 18th Avenue, West Bend, Wisconsin 53095.  The policy of insurance was in effect during the times of Wesley's claims.  West Bend is a proper party to the action pursuant to Wis. Stat. § 803.04.

## IV.  Factual Allegations[1]

### A. The County and Armor's pattern and practice of constitutionally inadequate care.

93.    In 2001, Milwaukee County entered into a consent decree governing medical care at the jail pursuant to *Christensen v. Sullivan*, Milwaukee County Circuit Court Case No. 1996-CV-1835.  Under the consent decree, Dr. Ronald Shansky was appointed as the Medical Monitor of the jail and has published

---

[1] Most of factual allegations are based on the discovery that has been permitted to date.  Without being permitted to undertake such discovery, Plaintiff would have been unable to go beyond the notice pleading requirements of Fed. R. Civ. P. 8(a).

reports documenting deficiencies at the jail. Dr. Shansky has repeatedly explained that as a result of inadequate staffing and monitoring, persons at the jail do not receive constitutionally required care and suffer severe delays in receiving care. The consent decree remains in force because the jail is not in substantial compliance with its provisions.

94. For example, in March 2014, Rebecca Terry was nine months pregnant. She went into labor and was denied medical care. Ms. Terry gave birth alone on the floor of a dirty cell.

95. In October 2014, Kwame Moore suffered intense sudden pain in his groin, consistent with testicular torsion. Mr. Moore complained to the County and Armor staff about the debilitating pain. Yet the County and Armor employees refused his requests for medical care. By the time Mr. Moore received medical care the following day, it was necessary to remove the affected testicle.

96. In April 2016, Terrill Thomas was suffering from bipolar disorder. Correctional officers shut off water to Mr. Thomas' cell. Mr. Thomas died—seven days later—because of dehydration.

97. In July 2016, Shade Swayzer was approximately nine months pregnant. Ms. Swayzer went into labor and was denied medical care. The child died.

98. In August 2016, Kristina Fiebrink was suffering from heroin withdrawal. Ms. Fiebrink screamed for help during the evening hours, was ignored and found dead the next morning.

99.    In October 2016, Michael Madden was suffering from heroin withdrawal.  He also had a heart condition which made the withdrawal worse. Mr. Madden died.

**B. Dr. White tells Wesley's attorney, "We are ready for action"**

100.    Wesley has a documented history of severe schizoaffective disorder that became impossible to manage without daily clozapine.

101.    Without daily clozapine, even a single dose, Wesley rapidly decompensates and his permanent mental state declines.

102.    It is well known in the field of mental health that clozapine is prescribed for difficult to treat schizoaffective and similar disorders.

103.    It is also well known that once clozapine has been shown to be effective, clozapine must not be abruptly discontinued.

104.    And it is well known that upon an abrupt discontinuation of clozapine, clozapine must be re-prescribed, and the patient closely monitored in a safe environment.

105.    Because Wesley was restored to competency on clozapine, on February 23, 2016 Wesley was to be transferred from Mendota to Milwaukee County to appear in court on his pending criminal case.

106.    In February 2016, Wesley's attorney contacted Captain Kerri McKenzie ("Cpt. McKenzie"), the Assistant Superintendent at the House of Corrections, to express concern about his client's pending transfer from Mendota

to the House of Correction, to discuss his continuity of care and stress the critical continuation of Wesley's clozapine.

107. Cpt. McKenzie contacted Dr. White and told her to speak with Wesley's attorney.

108. On February 5, 2016 Dr. White called Wesley's attorney and said she and her team had a plan for Wesley when he arrived, and everything would be fine.

109. On February 8, 2016 Wesley's attorney sent an email to Cpt. McKenzie, telling her that "I will get you a copy of [Wesley's] competency report so that you may review his circumstances and verify that he is appropriate for placement at HOC[.]"

110. On February 11, 2016 Wesley's attorney sent an email to Cpt. McKenzie and Dr. White attaching Wesley's competency report and further telling them that "[Wesley] is currently medicated with Lithium and Clozapine; the Clozapine requires weekly blood draws, as we discussed on the phone."

111. Because clozapine is a drug of last resort, pharmacies cannot dispense the medication without confirmation that it is safe for the patient to take the medication. The safety determination is made by entering the patient's blood results in the Clozapine REMS website. In short, if the blood work is not submitted into the system, clozapine will not be dispensed.

112. On February 11, 2016 Dr. White replied, "Thank you for the information. We are ready for action when this happens."

113.   On February 23, 2016 Travis Compere ("Compere"), the registered nurse unit manager at Mendota, sent an email to Dr. White telling her that "Omar is prescribed clozapine due to failure on other psychiatric medications" and "Dr. Phelps [] called and spoke to one of the nurse practitioners at the jail who assured him that Omar would not have a lapse in medication" and that "I was advised to include you in this conversation due to concern that a lapse in receiving medication would cause Omar to quickly decompensate."

114.   Dr. White replied, "I will follow up to make sure he gets what he needs."

115.   On February 23, 2016 Compere emailed a list of Wesley's medications to Dr. White showing that Wesley must receive 25mg of clozapine "every morning" and 275mg of clozapine "every bedtime."

116.   300mg of clozapine—taken daily in the manner prescribed—allowed Wesley to achieve between 300 to 600 nanograms of the medication in Wesley's blood stream, which was Wesley's successful therapeutic dosage.

117.   Clozapine has intense side effects, and for that reason the majority of the medication is prescribed for bedtime so that patients experience less intensity during the waking hours.

118.   On February 23, 2016 Mark Phelps ("Dr. Phelps") sent Dr. White an email telling her that "I spoke with Deb Mayo at the jail a week ago and talked with the mental health staff at the House of Correction" and "Deb Mayo reported

that the patient would be continued on clozapine and that she was a registered clozapine provider."

119.   On February 23, 2016 Wesley's attorney sent an email to Dr. White and Cpt. McKenzie informing them that Wesley was moved to the Milwaukee County Jail.

120.   Dr. White replied, "We have his meds situated and he will be well taken care of."

121.   On February 23, 2016 Dr. White sent an email to McKenzie, telling her that "[t]he same meds he was on at Mendota have also been ordered."

### C. The County and Armor failed to ensure or monitor Wesley's necessary medication

122.   On February 23, 2016 Wesley was not given clozapine because it – the medication - was "absent."

123.   On February 24, 2016 Wolf did a psychiatric evaluation of Wesley, reviewed his medical records and knew that he did not receive clozapine.

124.   On February 24, 2016 Wolf created and signed a drug exception request for clozapine for Wesley and noted on the form that "Mendota patient – decompensates quickly if 1 dose is missed of meds per Mark Phelps MD at Mendota."

125.   A drug exception request is a form that Armor requires to obtain medications that are not on Armor's formulary.

126. Armor contracted with Omnicare of Milwaukee ("Omnicare") to purchase medications that are not on Armor's formulary.

127. Wolf admitted during her deposition that "it would happen once or twice a week, that a certain antipsychotic wasn't available[.]"

128. On February 24, 2016 Dr. White sent an email to Wesley's attorney stating, "He was transferred last night to the HOC as is all set. We have his meds situated and he will be well taken care of."

129. On February 25, 2016 Wolf wrote a prescription and sent it to Omnicare. The prescription's start date is February 26, 2016 and its end date was June 24, 2016.

130. On February 28, 2016 Wesley was not given clozapine because it was "absent."

131. On March 1, 2016 Wesley did not receive clozapine because it was "absent."

132. On March 3, 2016 Wolf did a psychiatric follow up examination of Wesley, reviewed his medical records and knew that he did not receive his daily clozapine.

133. On March 3, 2016 Wesley did not receive clozapine because the medication was "not available."

134. On March 5, 2016 Wesley did not receive clozapine because it was "absent."

135. On March 6, 2016 Wesley did not receive clozapine because it was "absent."

136. On March 7, 2016 Wesley did not receive clozapine because the "medication [was] absent."

137. On March 8, 2016 Wesley's attorney sent an email to Dr. White "[c]hecking status on Mr. Wesley" and asking if "he [is] OK?"

138. On March 8, 2016 Dr. White replied that "I am very pleased to say that he is doing well. He is med compliant and has been adjusting well to his housing unit." Dr. White did not disclose that Wesley's clozapine was "absent."

139. On March 9, 2016 Dr. White and Wolf attended a mental health staff meeting at which they discussed Wesley and noted there are "[n]o problems when takes meds consistently" and referenced "[o]utside parties focused on Mr. Wesley's treatment."

140. On March 14, 2016 Wolf did a psychiatric follow up with Wesley, reviewed his medical records and knew he did not receive his daily doses of clozapine.

141. On March 21, 2016 Wolf did a psychiatric follow up with Wesley.

142. On March 29, 2016 Wesley did not receive clozapine because the medication was "missing."

143. On April 6, 2016 Wolf did a psychiatric follow up, reviewed Wesley's medical records and knew Wesley had missed doses of clozapine.

144.   On April 6, 2016 Wesley was moved from the House of Correction to the Milwaukee County Jail, Unit 4C.

145.   Per the County's Classification policy, "[a]ll classifications officers will": "[o]bserve inmates and record findings"; "[i]nterview inmates"; "[m]ake recommendations regarding inmate custody levels and program needs"; and "[m]ake housing assignments," among other duties.

146.   Unit 4C is where correctional officers assign mental health patients.

147.   Med pass on Unit 4C differs from med pass in other parts of the jail in that correctional officers on Unit 4C do mouth checks to ensure that mental health patients swallow prescribed medications—as such correctional officers are well aware that psychotropic medications are regularly unavailable to mental health patients.

148.   On April 6, 2016 Mayo did a mental health evaluation of Wesley and reviewed his medications.

149.   From April 6, 2016 to June 28, 2016 Mayo was the only nurse practitioner who managed Wesley's medications.

150.   Mayo failed to schedule regular appointments to manage and monitor Wesley's medications and health.

151.   On April 8, 2016 Wesley did not receive clozapine because it was "missing."

152.   On April 11, 2016 Wesley did not receive clozapine because the medication was "not available."

153. On April 12, 2016 Wesley told Kristin Murphy, an Armor Employee and social worker, that "I haven't gotten my meds in two days."

154. On April 12, 2016 Wesley did not receive clozapine because the medication was "not available."

155. On April 12, 2016 Wesley's attorney sent an email to Dr. White telling her that "[Wesley] believes he has not been receiving all of his medication" and "[Wesley] has expressed concern about this to the attendants/nurses 3 times" and "the response to his raising a concern was hostile" and "[h]is sleep patterns have been disrupted apparently as a result of the medication issues" and "his overall health could be threatened if the medication management and monitoring are not consistent."

156. On April 12, 2016 Dr. White asked Elipidio Mariano, M.D. ("Dr. Mariano") to visit Wesley to discuss his medications.

157. Dr. Mariano told Wesley that clozapine would be resumed that evening and Wesley remarked that he was "glad." Wesley was not given clozapine that evening.

158. During her deposition, Mayo testified

> Q. Now, earlier you had testified that if a patient on Clozaril missed three days or more of Clozaril, you could not start them at the same dosage level?
> **A. Even 48 hours, they recommend that you back it down to a lower -- to a lower milligram.**

159. Despite knowing that Wesley did not receive clozapine on April 8, 11 or 12, Mayo decided that it was "OK to continue Clozapine as ordered" at 300mg.

[26 / 64]

160.   On April 14, 2016 Wesley did not receive clozapine because it was "missing."

161.   On May 3, 2016 Markella Reed sent Mayo an email informing her that a pharmacist at Omnicare of Milwaukee told her that they had not received Wesley's blood results.

162.   On May 4, 2016 Wesley did not receive clozapine because the medication was "not available."

163.   On May 17, 2016 Omnicare called Mayo because the pharmacy did not receive Wesley's blood work.

164.   On May 31, 2016 Wesley did not receive clozapine because it was "not available."

165.   On June 3, 2016 Wesley did not receive clozapine because it was "missing."

166.   On June 6, 2016 Circuit Court Judge William Pocan found Omar Wesley NGI in his criminal case and entered an order committing Wesley to the custody of DHS pursuant to Section 971.17 of the Wisconsin Statutes.

167.   On June 6, 2016 Circuit Judge Pocan adopted the findings of a court-appointed forensic psychologist finding Omar Wesley appropriate for NGI conditional release to the community, committed Omar Wesley under Wis. Stat. § 971.17 (2) and ordered a pre-dispositional investigation and release plan.

168.   On June 21, 2016 Wesley did not receive clozapine because it was "missing."

169.   On June 23, 2016 Wesley did not receive clozapine because it was "missing."

170.   From June 24, 2016 to June 28, 2016 Wesley did not receive clozapine because the prescription expired per Wolf's order on February 25, 2016.

171.   Wesley was released from the Milwaukee County Jail pursuant to the court-ordered NGI conditional discharge on June 28, 2016 without clozapine or a way to obtain the medication, such as through a voucher or prescription.

172.   When released to the community on conditional discharge, Wesley had received inconsistent administration of Clozaril for months and had not received it at all for five days straight.

### D. Marshall, Cook and the DOC agents

173.   DHS contracts with WCS to provide case management services for mental health patients on NGI conditional release.

174.   DHS contracts with the Department of Corrections ("DOC") to supervise mental health patients on NGI conditional release.

175.   Brenda Wesley ("Ms. Wesley") is Omar Wesley's mother.

176.   Ms. Wesley is well known in Milwaukee as an advocate for improving the lives of all those impacted by mental health conditions.

177.   On June 8, 2016 Cook sent an email to Sarah Watson ("Watson"), a Corrections Field Supervisor, about assigning an agent to supervise Wesley when he is released from the jail.  The email states, in part, "[h]is [m]other is way way too involved – she works with NAMI."

178.    NAMI is the National Alliance on Mental Illness.

179.    NAMI's mission is "to educate, advocate, listen and lead to improve the lives of people with mental illness and their loved ones."

180.    On June 8, 2016 Watson replied to Cook's email, "Ughhhh!!!!  I am quite familiar with his mother.  This may be a problem as she strongly dislikes DOC."

181.    On June 8, 2016 Marshall's replied, "Yes, she's already a problem with me, the assigned case manager."

182.    On June 8, 2016 Watson assigned Nicholas Wintergerst ("Wintergerst") to supervise Wesley.

183.    On June 20, 2016 Marshall created a conditional release plan that required her to "monitor Mr. Wesley's clinical progress."

184.    At the time Marshall created the NGI conditional release plan, Marshall knew that Wesley was prescribed clozapine and that clozapine was a necessary medication; Marshall included reference to the Clozaril prescription in her release plan.

185.    Cook also knew that Wesley was prescribed clozapine, that clozapine was a necessary and approved medication according to the NGI conditional release plan.

186.    Williams, the final decisionmaker on Wesley's NGI conditional release plan, knew that Wesley was prescribed clozapine and that clozapine was a necessary mediation and approved per the conditional release plan.

187. On June 28, 2016 Milwaukee Circuit Court Judge Pocan adopted the WCS conditional release plan, ordered a nine-year term of civil commitment for Mr. Wesley under Wis. Stat. § 971.17 (3), and released Mr. Wesley to the community under NGI conditional discharge to the custody of Tawana Marshall or her designee.

188. Marshall and Cook knew from prior experience picking up conditional release patients from the jail that Armor and the County does not release mental health patients with medications.

189. Marshall and Cook knew from prior experience picking up conditional release patients from the jail that Wesley would not receive clozapine absent a voucher or prescription.

190. Marshall and Cook took no steps to ensure that Wesley would receive clozapine once he was released from jail, despite their specific reference to the medication's necessity in their own NGI conditional release plan.

191. On June 28, 2016 Robert Hamilton ("Hamilton"), a WCS case manager, picked up Wesley from the jail without a voucher or prescription from clozapine and drove him to a group home.

192. The group home, aware that clozapine was a critical medication, called Marshall told her that Armor and the County failed to provide a voucher or prescription for clozapine. Marshall did nothing to get Wesley his required clozapine.

193.   On June 29, 2016 Marshall met Wesley at the group home.  Wesley told Marshall that Armor and the County stopped clozapine before he was released.  Marshall did nothing to get Wesley his required clozapine.

194.   On June 30, 2016 Marshall, Cook and Wesley met with Dr. Ewing. Marshall told Dr. Ewing that Armor and the County stopped clozapine.  Dr. Ewing was "alarmed" and told Marshall to contact Armor to find out why the medication was halted.

195.   Dr. Ewing knew that clozapine was critical to restoring Wesley to competency and benztropine was critical to managing the side effects of clozapine, yet he failed to prescribe either medication.

196.   On July 7, 2016 Wesley's attorney spoke with Dr. White about the unlawful lapses in clozapine and treatment for Wesley.

197.   White knew that Wesley did not receive clozapine because psychotropic medications were regularly unavailable to mental health patients and, more specifically, that Wesley's prescription ended on June 24, 2016—but she lied to Wesley's attorney, telling him that someone had failed to submit blood work to the Clozapine REMS website.

198.   On July 8, 2016 Dr. White faxed Wesley's most recent blood results to Cook.  Cook forwarded the results to Dr. Ewing who then re-prescribed clozapine.  The medication was filled by WCS's pharmacy.

199.   Dr. Ewing did not, however, prescribe benztropine to manage Wesley's side effects.

200.    On July 8, 2016 Wesley took clozapine and experienced significant side effects without having his benztropine.

201.    Because of the side effects, Wesley did not take clozapine on July 9, 2016 or July 10, 2016.

202.    Wesley's attorney met with Wesley on July 11, 2016 and Wesley took the medication on that day and on the next day, July 12, 2016.

### E. Williams and the conditional release team's decision to jail Wesley on July 13, 2016

203.    On July 13, 2016 Marshall, Cook, Wintergerst and Williams had a meeting to discuss whether Wesley should be jailed.

204.    When asked how Wesley posed a danger to the community during her deposition in this case, Marshall responded:

> Q. What did Mr. Wesley do on or before July 13th to make him a danger to the community?
> **A. When you leave the group home in the middle of the night, that's a danger. Because during that time, we had witnessed that a police officer shot an innocent boy in the park, and the park was not too far from the group home. So by Mr. Wesley walking the streets at night, there's a danger, you know, for his safety. Not for only the community, but for his safety as well. So that was a huge risk right there.**

205.    At the July 13, 2016 meeting, Williams, Marshall, Cook and Wintergerst knew Wesley's clozapine lapsed—through no fault of his own—before he was released from the Milwaukee County Jail.

206. Williams knew at the July 13, 2016 meeting that WCS had failed to earlier ensure that Wesley would receive clozapine upon his release from the Milwaukee County Jail on June 28, 2016.

207. Williams also knew that WCS failed to provide clozapine to Wesley before July 8, 2016.

208. Williams knew that because of these constitutional failures Wesley had been off clozapine from June 24, 2016 to July 7, 2016.

209. Williams knew that because Wesley had been off of clozapine for more than 48 hours that the dosage of clozapine had to be titrated from 25mg per day over several weeks to Wesley's therapeutic dosage of 300mg per day, and that Wesley was at the beginning dosage of 25mg.

210. Williams knew that while Wesley refused to take clozapine on July 9, 2016 and July 10, 2016, no one had contacted Wesley's attorney or mother to request assistance in speaking with Wesley.

211. Williams also knew that Wesley's stated refusal on July 9, 2016 and July 10, 2016 was due to the side effects that he was experiencing because Dr. Ewing had failed to prescribe Wesley his regular medication to manage these side effects.

212. Williams knew that Wesley's attorney met with Wesley on July 11, 2016 and Wesley took clozapine on that day, and again on July 12, 2016, despite still not having the appropriate side effect medication.

213.   On July 13, 2016 Williams knew that Wesley had not exhibited any suicidal behaviors at the group home after his release to the community.

214.   On July 13, 2016 Williams knew that Wesley had not exhibited any aggressive behaviors at the group home after his release to the community.

215.   On July 13, 2016 Williams knew that Wesley was not a danger to himself or others at the group home after his release to the community.

216.   Williams was the final decisionmaker at the July 13, 2016 meeting and decided to jail Wesley.

217.   Williams decided to jail Wesley because of his mental health disability.

218.   Williams not only decided to jail Wesley, but also to seek revocation of Wesley's NGI conditional release.

219.   Williams' decision to seek revocation of Wesley's conditional release was also because of Wesley's NGI mental health disability.

220.   Williams' irrational belief that Wesley's mental health could only be managed in institutional care had no basis in fact.

221.   Williams decided to send Wesley back to the Milwaukee County Jail, a place where Williams knew Wesley likely would not regularly receive clozapine.

222.   Williams' decision to send Wesley to the Milwaukee County Jail rather than to inpatient care was also because of Wesley's mental health disability.

223. Williams' irrational belief that the Milwaukee County Jail was a place where Wesley's mental health could be managed had no basis in fact.

224. At the time of his detention, any belief by Williams that Wesley presented a danger to himself or others because of his mental health disability had no basis in fact.

### F. Marshall, Cook and the release team's failure to provide necessary medication

225. On July 13, 2016 Wintergerst drove Wesley to the Milwaukee County Jail.

226. WCS's obligation pursuant to the NGI conditional release program did not end when Wesley was jailed, as the Circuit Court had not yet decided whether to revoke his NGI conditional release.

227. Wintergerst attempted to give Armor and the County Wesley's medications upon his return to the jail on July 13, 2016; Armor and the County refused.

228. During her deposition, Marshall reported that, on July 13, 2016, she faxed over Wesley's medication list, called Armor and was told Wesley would receive clozapine.

229. On July 15, 2016 Marshall called Armor and inquired whether Wesley was receiving clozapine. Armor confirmed that he was not.

230. On July 15, 2016 Marshall sent an email to Cook and Williams informing them that Wesley was not receiving clozapine at the Jail.

231. Marshall, Cook and Williams did not take any reasonable steps to ensure that Wesley would receive his daily clozapine regimen after he was jailed.

232. Marshall, Cook and Williams did not take any reasonable steps to ensure that Wesley could continue to participate in programs or activities in the NGI conditional release program.

233. In fact, Marshall, Cook and Williams completely abandoned Wesley after they jailed him on July 13, 2016 and sought revocation of his conditional release.

## G. The County and Armor's continuing failure to ensure or monitor necessary medication and lying about it

234. Wesley did not receive a therapeutic dose of clozapine during the entire month of July 2016.

235. Wesley did not receive his clozapine at all from July 13, 2016 to July 21, 2016, even though clozapine was checked into the jail on July 19, 2016.

236. On July 25, 2016 Wesley did not receive clozapine because the medication was "absent."

237. On July 26, 2016 Dr. White sent an email to Holifield and McCullough that she received a subpoena "due to us not providing [Wesley's] medication" and that "I am looking at his chart now and he missed several days with 'absent' on the [medication administration record]" and that "this individual needs to have his medication every day."

238. Wesley did not receive a therapeutic dose of clozapine during the entire month of August 2016.

239. From August 1, 2016 to August 10, 2016 Wesley did not receive clozapine because it was unscheduled or "missing."

240. On August 2, 2016 McCullough sent an email to Holifield directing Holifield to "check to make sure every day he is getting his medications" and stating that "we need to make sure he has the option to take his meds every dose."

241. On August 3, 2016 Mayo sent an email to White stating that "[Wesley] really shouldn't miss any days" and that "I am a little concerned it might take a day or two for us to get them."

242. On August 4, 2016 White sent an email to Mayo stating that "I see the orders on the [medication administration record] but not evidence if it was given. I am also going to be keeping track too."

243. On August 9, 2016 McCullough sent an email to Holifield about "why [Wesley's] meds were missed and not re-ordered timely."

244. On August 9, 2016 Dr. White testified before Milwaukee Circuit Court Judge Pocan at Wesley's revocation hearing. Dr. White admitted that she "communicat[ed]" with Wesley's attorney about "Wesley's transfer from Mendota and his ongoing care and medication administration" at the Milwaukee County Jail and House of Correction between February 2016 and August 2016 and those communications included "continuing the medications and regimen from Mendota[.]"

245. However, Dr. White repeatedly lied in court about the reasons for the lapses in Wesley's medications: testifying that "I can't say for sure what happened" and "there could be a variety of reasons" and "we still don't know" and falsely suggesting that "it was the blood draw issue."

246. Dr. White also repeatedly lied in court about Wesley refusing medications, stating repeatedly that he was not "compliant" or was not "100 percent compliant," when in fact Dr. White knew that the lapses were due to Armor's failure to timely acquire the medications and provide them to Wesley on a daily basis.

247. Dr. White also testified in court that part of "the process is to make sure that someone would be stabilized to get released" and "[s]o part of the release plan would be looking at the medications[.]"

248. On August 10, 2016 Judge Pocan denied the petition to revoke Omar Wesley's conditional release, finding that Armor and the County caused any disruption in the release plan, and ordered Wesley to be returned to the community on NGI conditional release.

249. On August 10, 2016 Dr. White sent an email to Holifield and McCullough stating, "We have the aftercare plan situated" and that "I want to make sure that this situation is taken care of so there are no additional issues with his medications."

250. On August 10, 2016 Wesley was released from the Milwaukee County Jail to the care and custody of WCS.

251. At the time Wesley was released to WCS, Wesley was not receiving his therapeutic dosage of 300mg of clozapine daily and was suffering from psychosis.

252. Wesley decompensated, lost his competency and was sent to Mendota on August 26, 2016. He remains there today.

## V. Claims for Relief

### A. Claims against the Armor Defendants (Armor, Dr. White, Wolf, Mayo, Holifield and McCullough)

253. Wesley incorporates here all other paragraphs in this complaint.

### (i) Monell

254. Armor had a policy and practice of providing inadequate medical care to mental health and other patients at the Milwaukee County Jail and House of Correction.

255. Section 1.11 of Armor's contract with Milwaukee County provides that "Armor shall provide pharmacy services management, including and administering medicines, including prescribed drugs to the Inmates."

256. Section 1.2 of Armor's contract provides that "Armor shall provide or arrange for on a regular basis, all professional medical, dental, mental health, and related health care and administrative services for each Inmate[.]"

257. Article II of Armor's contract is titled "Mental Health Services" and provides that "Armor will use reasonable effort to facilitate continuation of care and facilitate placement in the community upon release for inmates with

diagnosed mental health issues, when security provides reasonable advance notice of release."

258.   Section 4.1 states that "Armor's services shall be designed to meet the National Commission on Correctional Health Care for Jails (NCCHC) standards[.]"

259.   NCCHC standard J-D-02 (Medication Services) cautions, "Unless medications are taken as prescribed, maintaining a therapeutic dose of medications may not be possible, which may have grave consequences to patient health."

260.   Armor, Dr. White, Holifield, and McCullough knew that on a daily or weekly basis mental health patients were not receiving necessary psychotropic medications from reports from med pass nurses (and others, including correctional officers), observation and communications with pharmacies.

261.   Armor, Dr. White, Holifield, and McCullough knew that because mental health patients were not receiving necessary psychotropic medications they were being injured.

262.   Armor failed to train or even present employees with its policies or procedures.

263.   Armor failed to discipline employees appropriately so that inadequate medical care would not be the policy and practice.

264. Armor was aware that its written policy requiring that "at least weekly" review of "each patient prescribed psychotropic medication" was not occurring.

265. Armor was aware that its written policy requiring referral to mental health staff when a patient misses "three (3) or more doses within a 7 day period" was not occurring.

266. Armor was aware that its written policy requiring referral to mental health staff whenever "behavior suggests [a] medication problem" was not occurring.

267. Armor was aware that its written policy requiring "development and implementation of a treatment [] plan" was not occurring for mental health patients at the jail.

268. Armor was aware that its actual custom and policy was that its patients, including Wesley, were deprived of constitutional adequate medical care.

269. Armor's custom and policy of deliberately indifference to the serious medical needs of mental health patients, including Wesley, for psychotropic medication was a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

### (ii) Unconstitutionally Inadequate Medical Care

270. Dr. White provided inadequate medical care and treatment by failing to ensure that Wesley would receive clozapine, a necessary psychotropic medication.

271. Dr. White also failed to supervise the delivery of medication and mental health services to Wesley after she knew that Wesley was not receiving clozapine on a regular basis.

272. Dr. White also failed to discipline *anyone* for lapses in Wesley's medication.

273. Dr. White compounded her failures by repeatedly lying and pointing fingers at others.

274. Dr. White's violations of Wesley's constitutional rights were causes in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

275. Wolf provided inadequate medical care and treatment to Wesley by failing to ensure that Wesley would receive clozapine.

276. Wolf also failed to supervise the delivery of medication and mental health services to Wesley after she knew that Wesley was not receiving clozapine on a regular basis.

277. Wolf's violations of Wesley's constitutional rights were causes in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

278. Mayo provided inadequate medical care and treatment to Wesley by failing to ensure that Wesley would receive clozapine.

279. Mayo also failed to supervise the delivery of medication and mental health services to Wesley after she knew that Wesley was not receiving clozapine on a regular basis.

280. Mayo also failed to schedule regular appointments with Wesley to monitor his health and medication management.

281. Mayo's violations of Wesley's constitutional rights were causes in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

282. Holifield provided inadequate medical care and treatment to Wesley by failing to ensure that Wesley would receive clozapine.

283. Holifield also failed to supervise the delivery of medication after she knew Wesley was not receiving clozapine on a regular basis.

284. Holifield's violations of Wesley's constitutional rights were causes in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

285. McCullough provided inadequate medical care and treatment to Wesley by failing to ensure that Wesley would receive clozapine.

286. McCullough also failed to supervise the delivery of medication after she knew Wesley was not receiving clozapine on a regular basis.

287. McCullough also failed to discipline *anyone* for lapses in Wesley's medication. Indeed, she promoted Adriano after she failed to provide Wesley with medication—even though her investigation determined that the medication was available to provide to Wesley.

288. McCullough's violations of Wesley's constitutional rights were causes in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(iii)  Negligence**

289. The Armor Defendants undertook and owed to Wesley the duty to make reasonable efforts to care for him in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves.

290. Notwithstanding the aforementioned duties, the Armor Defendants treated Wesley in a manner that was extremely negligent, careless, reckless and without concern for his safety.

291. That the Armor Defendants, in the face of Wesley's obvious need for medical attention and assistance, failed to obtain medical attention, failed to

identify a medical emergency, and/or failed to act as required, including failing to provide him his daily doses of clozapine.

292. Wesley was always a patient of the Armor Defendants.

293. The Armor Defendants always had a duty to provide medical care to Wesley, which duty required them to use the degree of care, skill and judgment usually exercised by a reasonable provider in the same or similar circumstances.

294. The Armor Defendants were negligent in their care and treatment of Wesley at all times material hereto, including as set forth above, in that they failed to possess/exercise that degree of care, skill and judgment usually exercised by a mental health professional, in that they, among other things, failed to monitor Wesley's decompensation and failed to make clozapine available to him as was required.

295. The Armor Defendants were negligent in their care and treatment of Wesley at all times material hereto, in that among others, the Armor Defendants failed to possess/exercise that degree of care, skill and judgment usually exercised by a reasonable provider in the same or similar circumstances, in that it, among other things, negligently treated Wesley's acute mental illness and was otherwise negligent.

296. The Armor Defendants' negligence as alleged herein was a cause of Wesley's injuries and losses, and as a result of Defendants' negligence, Wesley sustained permanent severe injuries, including past and future pain, suffering, disability, emotional and mental distress, loss of freedom and enjoyment of life,

past and future medical expenses; and all damages allowed under Wisconsin law, all to the damage to him in an amount to be determined at a trial of this matter. In addition, as a result of the Armor Defendants' negligence, Wesley has been determined to be incompetent and is confined in a mental health center indefinitely, and likely for rest of his life.

## B. Claims against the County Defendants (Milwaukee County, Maj. Evans and Dep. Insp. Nyklewicz)

297.   Wesley incorporates here all other paragraphs in this complaint.

## (i)   Monell

298.   Milwaukee County, Maj. Evans and Dep. Insp. Nyklewicz had a policy and practice of providing inadequate medical care to mental health and other patients at the Milwaukee County Jail and House of Correction.

299.   Section 12.14 of Milwaukee County's contract with Armor provides "The Sheriff or Superintendent or their designees (so designated in writing by the Sheriff and Superintendent) shall be the liaison with Armor for each Facility."

300.   Milwaukee County, Maj. Evans and Dep. Insp. Nyklewicz knew that on a daily or weekly basis mental health patients were not receiving necessary psychotropic medications from reports from correctional officers (and others), observation and meetings with Armor's staff.

301.   Milwaukee County, Maj. Evans and Dep. Insp. Nyklewicz knew that because mental health patients were not receiving necessary psychotropic

medications, they were being deprived of their constitutionally mandated health care and were being injured.

302. Milwaukee County failed to appropriately monitor its contract with Armor so that inadequate medical care would not be the policy and practice.

303. Milwaukee County failed to supervise and direct Armor to comply with its constitutionally mandated health care obligations.

304. Milwaukee County also failed to train or even present employees with its policies or procedures so as to ensure that patients, like Wesley, received their constitutionally mandated health care.

305. Milwaukee County failed to discipline employees appropriately so that unconstitutionally inadequate medical care would not be the actual policy and practice.

306. Milwaukee County's deliberately indifferent policies and practices were causes in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(ii)  Unconstitutionally Inadequate Medical Care**

307. Maj. Evans provided inadequate medical care and treatment by failing to address the daily or weekly failure to provide psychotropic medications to mental health patients.

308. Maj. Evans also failed to intervene or take any appropriate steps against Armor for these daily or weekly failures.

309. Maj. Evans's violation of Wesley's constitutional rights is a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

310. Dep. Insp. Nyklewicz provided inadequate medical care and treatment by failing to address the daily or weekly failure to provide psychotropic medications to mental health patients.

311. Dep. Insp. Nyklewicz failed to intervene or take any appropriate steps against Armor for these daily or weekly failures.

312. Dep. Insp. Nyklewicz's violations of Wesley's constitutional rights is a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(iii) Negligence**

313. The County Defendants undertook and owed to Wesley the duty to make reasonable efforts to care for him in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves.

314. Notwithstanding the aforementioned duties, the County Defendants treated Wesley in a manner that was extremely negligent, careless, reckless and without concern for his safety.

315.   That County Defendants, in the face of Wesley's obvious need for medical attention and assistance, failed to obtain medical attention, failed to identify a medical emergency, and/or failed to act as required, specifically failed to provide him his daily doses of clozapine.

316.   Wesley was always a patient of the County Defendants.

317.   The County Defendants always had a duty to provide medical care to Wesley, which duty required them to use the degree of care, skill and judgment usually exercised by a reasonable provider in the same or similar circumstances.

318.   The County Defendants were negligent in their care and treatment of Wesley at all times material hereto, including as set forth above, in that they failed to possess/exercise that degree of care, skill and judgment usually exercised by a mental health professional, in that they, among other things, failed to monitor Wesley's decompensation and failed to make clozapine available to him daily as was required.

319.   The County Defendants were negligent in their care and treatment of Wesley at all times material hereto, in that among others, the County Defendants failed to possess/exercise that degree of care, skill and judgment usually exercised by a reasonable provider in the same or similar circumstances, in that it, among other things, negligently treated Wesley's acute mental illness and was otherwise negligent.

320.   The County Defendants' negligence as alleged herein was a cause of Wesley's injuries and losses, including that Wesley sustained permanent severe

injuries, including past and future pain, suffering, disability, emotional and mental distress, loss of freedom and enjoyment of life, past and future medical expenses; and all damages allowed under Wisconsin law, all to the damage to him in an amount to be determined at a trial of this matter. In addition, as a result of the County Defendants' negligence, Wesley has been determined to be incompetent and is confined in a mental health center indefinitely, and likely for rest of his life.

### C. Claims against the WCS Defendants (WCS, Marshall, Cook and Dr. Ewing)

321. Wesley incorporates here all other paragraphs in this complaint.

### (i)  Monell

322. WCS, Lori Akstulewicz ("Akstulewicz") (WCS's Program Director) and Cook knew that conditional release participants released from the Milwaukee County Jail would not be released with necessary psychotropic medications.

323. WCS, Akstulewicz and Cook lacked a policy to ensure continuation of necessary psychotropic medications for patients being released from the Milwaukee County Jail.

324. WCS, Akstulewicz and Cook also lacked a policy to ensure continuation of necessary psychotropic medications for patients being sent to the Milwaukee County Jail.

325. WCS, Akstulewicz and Cook also lacked a policy requiring continuation of programs or activities for mental health patients at the Milwaukee County Jail prior to revocation.

326. WCS's unconstitutional policy of deliberate indifference towards mental health patients being released from the Milwaukee County Jail without necessary psychotropic medications was a cause of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(ii)    Unconstitutionally Inadequate Medical Care**

327. Marshall provided inadequate medical care and treatment by failing to ensure that Wesley would receive his daily clozapine.

328. Marshall's constitutional violations were a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

329. Cook provided inadequate medical care and treatment by failing to ensure that Wesley would receive clozapine.

330. Cook also failed to discipline Marshall for her failure to take step to ensure that Wesley would receive clozapine before he released from the Milwaukee County Jail.

331. Cook's constitutional violations were a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

332.   Dr. Ewing provided inadequate medical care and treatment by failing to ensure that Wesley would receive clozapine.

333.   Dr. Ewing's constitutional violations were a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(iii)   Equal Protection**

334.   Marshall and Cook also discriminated against Wesley because of his mental health disabilities when they recommended detaining Wesley at the Milwaukee County Jail and revoking his conditional release.

335.   Marshall and Cook's discrimination caused exclusion from conditional release programs or activities.

336.   Marshall and Cook did not recommend jail for any similarly situated person was jailed for missing two days of psychotropic medication.

337.   Marshall and Cook did not recommend revocation of conditional release for any other similarly situated person for missing two days of psychotropic medication.

338.   Marshall and Cook did not recommend jail or revocation of conditional release for other persons who were psychiatrically unstable.

339.   Marshall and Cook did not consider any alternatives to jail or revocation.

340.   Marshall and Cook deviated sharply from WCS's policy of "community based hospitalization."

341. Marshall and Cook deviated sharply from WCS's written policy prohibiting the jailing of persons who are psychiatrically unstable.

342. Marshall and Cook's violations of Wesley's constitutional rights were a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(iv) Negligence**

343. The WCS Defendants undertook and owed to Wesley the duty to make reasonable efforts to care for him in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves.

344. Notwithstanding the aforementioned duties, the WCS Defendants treated Wesley in a manner that was extremely negligent, careless, reckless and without concern for his safety.

345. That the WCS Defendants, in the face of Wesley's obvious need for medical attention and assistance, failed to obtain medical attention, failed to identify a medical emergency, and/or failed to act as required.

346. Wesley was always a patient of the WCS Defendants.

347. The WCS Defendants had a duty to provide medical care to Wesley, which duty required them to use the degree of care, skill and judgment usually exercised by a reasonable provider in the same or similar circumstances.

348.   The WCS Defendants were negligent in their care and treatment of Wesley at all times material hereto, including as set forth above, in that they failed to possess/exercise that degree of care, skill and judgment usually exercised by a mental health professional, in that they, among other things, failed to monitor Wesley's decompensation and failed to make clozapine available to him as was required.

349.   The WCS Defendants were negligent in their care and treatment of Wesley at all times material hereto, in that among others, the WCS Defendants failed to possess/exercise that degree of care, skill and judgment usually exercised by a reasonable provider in the same or similar circumstances, in that it, among other things, negligently treated Wesley's acute mental illness and was otherwise negligent.

350.   The WCS Defendants' negligence as alleged herein was a cause of Wesley's injuries and losses, including that Wesley sustained permanent severe injuries, including past and future pain, suffering, disability, emotional and mental distress, loss of freedom and enjoyment of life, past and future medical expenses; and all damages allowed under Wisconsin law, all to the damage to her in an amount to be determined at a trial of this matter.  In addition, as a result of the WCS Defendants' negligence, Wesley has been determined to be incompetent and is confined in a mental health center indefinitely, and likely for rest of his life.

351. In addition, by at least June 28, 2016 Dr. Ewing had a duty to review Wesley's medical history prior to prescribing any medication other than clozapine, benztropine and lithium carbonate.

352. Dr. Ewing negligently relied on Wesley's statement that he had taken loxapine (or Loxitane) previously and had not experienced side effects.

353. At the time Dr. Ewing "relied" on Wesley's statement, Dr. Ewing had already determined that Wesley was experiencing psychosis and knew that Wesley was not a reliable historian due to the fact Wesley had been deprived of his daily doses of clozapine.

354. Dr. Ewing's duty, and obligation, was to follow the only medication regimen that had worked for Wesley, which Dr. Ewing knew was critical to restoring Wesley to competency and continuing Wesley's psychiatric stability.

355. Dr. Ewing's failure to so act constitutes negligence; and that such negligence was a cause of Wesley's injuries and losses, including that Wesley sustained permanent severe injuries, including past and future pain, suffering, disability, emotional and mental distress, loss of freedom and enjoyment of life, past and future medical expenses; and all damages allowed under Wisconsin law, all to the damage to him in an amount to be determined at a trial of this matter. In addition, as a result of the County Defendants' negligence, Wesley has been determined to be incompetent and is confined in a mental health center indefinitely, and likely for rest of his life.

**(v) Claims Against Suzanne Williams**

356. Wesley incorporates here all other paragraphs in this complaint.

**(i)    Unconstitutionally Inadequate Medical Care**

357. Williams provided inadequate medical care and treatment by failing to ensure that Wesley would receive his daily clozapine.

358. Williams also provided inadequate medical care and treatment by failing to address WCS's failure to provide daily clozapine to Wesley.

359. Williams also failed to intervene or take any appropriate steps against WCS for its failures.

360. Williams violations of Wesley's constitutional rights was a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(ii)    Equal Protection**

361. Wesley also had the clearly established constitutional right to enjoy the equal protection of the laws and to be free from intentional discrimination in the form of arbitrary and irrational treatment that differs from the treatment of similarly situated individuals.

362. Any reasonable government official knew or should have know of these clearly established rights.

363. Wesley's mental health disability was the reason for Williams decision to jail Wesley and seek revocation of his conditional release.

364. Williams targeted Wesley because of his mental health disability as shown in her deposition testimony, including:

> Q. Did you take into consideration the fact that Mr. Wesley, when he was released from the jail and prior to that, did not have his medication? **A. His symptoms would have created a risk regardless. So, unfortunately, even though it wasn't necessarily his fault he didn't have the medications, they – not having access to the medications resulted in decompensation, which presented a risk that was too great to remain in the community.**

365. Williams admitted in her deposition that the claimed "risk" was "delusional thinking[.]"

366. Williams treated Wesley less favorably than similarly situated conditional release patients who were not experiencing psychiatric instability.

367. Williams' actions were objectively unreasonable and/or discriminatory considering the facts and circumstances confronting her and the conditional release team.

368. There was no rational basis for Williams' discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

369. Williams intentionally, willfully and wantonly targeted Wesley because of his psychiatric instability and she unlawfully treated him less favorably than individuals who were similarly situated in every material respect.

370. Williams differential treatment was wholly arbitrary and unconstitutional.

371. Williams discriminated against Wesley because of his mental health disabilities.

372. Williams' discrimination caused exclusion from conditional release programs or activities.

373. No other similarly situated person was jailed for missing two days of psychotropic medication.

374. Williams did not seek revocation of conditional release for any other similarly situated person for missing two days of psychotropic medication.

375. Williams did not consider any alternatives to jail or revocation.

376. Williams jailed and sought revocation of conditional release solely because it was reported that Wesley was psychiatrically unstable.

377. Williams did not jail or seek revocation of conditional release for other persons who were psychiatrically unstable.

378. Williams violations of Wesley's constitutional rights was a cause in fact of Wesley's injuries, without limitation to physical pain and suffering, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**(iii) Disability Discrimination**

379. Title II (42 U.S.C. §§ 12131-12134) and Section 504 of the Rehabilitation Act of 1973 ("Section 504") (29 U.S.C. § 794) prohibits disability-based discrimination by Williams, including the denial of opportunities to benefit from services, the failure to reasonably modify policies and procedures, and imposing methods of administration that have the effect of discrimination on the basis of duality.

380.   Title II applies to public entities, which include state and local government, and their departments and agencies.   Section 504 applies to programs and activities of recipients of federal financial assistance.   DHS receives federal financial assistance and operates a supervised release program and activity.

381.   Congress enacted the ADA nearly 25 years ago "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."   42 U.S.C. § 12101(b)(1).   Congress found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, [and] independent living" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to . . . pursue those opportunities for which our free society is justifiably famous."   42 U.S.C. § 12101(a)(7), (8).

382.   Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.

383.   Congress enacted the ADA to broaden the coverage of the Rehabilitation Act of 1973, which similarly prohibits discrimination against individuals with disabilities by recipients of federal financial assistance.   29 U.S.C. § 794.

384. Section 504 similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

385. Title II covers essentially everything state and local governments and their agencies do. *See Pa. Dept. of Corrs. v. Yeskey*, 524 U.S. 206, 209-12 (1998) (discussing the breadth of Title II's coverage). Section 504 also applies to all of the activities of agencies that are federally funded and as a general rule violation of Section 504 also constitute violations of Title II.

386. A "program or activity" is defined under Section 504 to include "all of the operations of a department, agency, . . . or other instrumentality of a State or of a local government" and "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b)(1)(A), (B). As such, all operations of a state government agency are covered by Section 504 if any part of it receives federal financial assistance.

387. Under these regulations, covered entities may not directly, contractually, or through other arrangements "deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i); see also 45 C.F.R. § 84.4(b)(1)(i). Covered

entities also may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii); *see also* 45 C.F.R. § 84.4(b)(1)(ii).

388. Covered entities may not "utilize criteria or methods of administration "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability [or] that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i), (ii); see also 45 C.F.R. § 84.4(b)(4)(i), (ii).

389. In addition to these prohibitions, covered entities must take certain steps to avoid discrimination on the basis of disability. In particular, covered entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(7); *see also* 45 C.F.R. § 84.4(a); U.S. Dep't of Justice, Title II Technical Assistance Manual § II-6.1000, Illustration 2 (1993) (explaining that public entities may need to make modifications to programs such as individualized assistance to permit individuals with disabilities to benefit).

390.   This includes a prohibition on making custody decisions on the basis of generalized assumptions about disability, relegating those on supervised release with disabilities to lesser services and opportunities, imposing overprotective or unnecessarily restrictive rules, and failing to reasonably modify policies, practices, and procedures.  42 U.S.C. § 12101(a)(5).

391.   Williams repeatedly and continuously denied Wesley the opportunity to participate in and benefit from services, programs, and activities, and has otherwise subjected him to discrimination in violation of Title II.  42 U.S.C. § 12132.

392.   Williams also violated Section 504. 29 U.S.C. § 794(a).  Williams failed to individually analyze Wesley to determine what services and supports were appropriate for him in an effort to prevent Wesley's further decompensation and incarceration.  Williams also failed to (1) implement appropriate services when they learned of failure to provide clozapine; (2) identify appropriate service plan tasks; (3) assist Wesley in meeting service plan tasks to achieve normalcy; and (4) impose only necessary and legitimate safety requirements.

393.   Williams also violated her obligations under Title II and Section 504 by (1) denying Wesley equal opportunities to participate in and benefit from its services, programs, and activities, 28 C.F.R. § 35.130(a), (b)(1)(i)-(ii); 45 C.F.R. § 84.4(a), (b)(1)(i)-(ii); (2) utilizing criteria and methods of administration having the effect of discriminating against Wesley on the basis of disability and defeating or substantially impairing accomplishment of the objectives of its reunification

program with respect to Wesley, 28 C.F.R. § 35.130(b)(3); 45 C.F.R. § 84.4(b)(3); and (3) failing to reasonably modify its policies, practices, and procedures where necessary to avoid discriminating against Wesley on the basis of her disability, 28 C.F.R. § 35.130(b)(7).

394. Wesley has been injured and will likely suffer future injury, as a result of violations of Title II and Section 504.

## VI. **Relief Requested**

395. Wherefore, Wesley respectfully requests that this Court for him and against each defendant, together with pre- and post-judgment interest, and grant the following relief:

    a. Award Wesley compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of freedom and enjoyment of life and all other nonpecuniary losses;

    b. Award Wesley damages for physical pain and suffering;

    c. Award Wesley punitive damages;

    d. Award Wesley's costs incurred in pursuing this action;

    e. Award Wesley's attorneys' fees incurred in pursuing this action;

    f. Award Wesley's experts' fees incurred in pursuing this action;

    g. Declaratory and injunctive relief, as appropriate; and

    h. Grant such other and further relief as this Court may deem just and proper.

# VII. Demand for Trial by Jury

396.   Wesley hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38(b)(1) and the Seventh Amendment to the U.S. Constitution.


Dated at the law office of GINGRAS, THOMSEN & WACHS, LLP in Milwaukee, Wisconsin, on this 17th day of August, 2020.

*/s/ William F. Sulton*
MARK L. THOMSEN
WILLIAM F. SULTON

GINGRAS, THOMSEN & WACHS, LLP
Suite 520
219 N Milwaukee Street
Milwaukee, WI 53202
414-778-0700
mthomsen@gtwlawyers.com
wsulton@gtwlawyers.com

CRAIG A. MASTANTUONO

MASTANTUONO & COFFEE, S.C.
Suite 520
219 N Milwaukee Street
Milwaukee, WI 53202
414-276-8662
cmast@cmrc-law.com

*Attorneys for Plaintiff Omar Wesley*