UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

OMAR H WESLEY,
by next friend BRENDA WESLEY,

                    Plaintiff,

                                                    Case No. 19-cv-0918-bhl

        v.

ARMOR CORRECTIONAL HEALTH
SERVICES INC, et al.,

                    Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT

According to his mother, Brenda, Plaintiff Omar Wesley entered the Milwaukee County Jail with his schizophrenia and severe schizoaffective and antisocial personality disorders under control. Seven months later, he had completely decompensated. Mrs. Wesley, acting as Omar's next friend, brought this suit against a host of Defendants she judged responsible for the allegedly inadequate medical care her son received while incarcerated. Since its inception, the case has narrowed considerably, and, at this point, only three groups of defendants remain: (1) the County Defendants, including Milwaukee County and Wisconsin County Mutual Insurance Corporation; (2) the Armor Defendants, including Armor Correctional Health Services, Inc. (Armor), Dr. Maureen White, Kayla McCullough, Courtney Holifield, and Kim Wolf; and (3) Nurse Practitioner Deborah Mayo, an independent contractor retained by Armor, and her insurer, Evanston Insurance Company. All three groups have moved for summary judgment. Plaintiff has cross-moved for summary judgment against the County and Armor Defendants but concedes that the case against the third group (Mayo and Evanston) must go to trial. Because the record confirms that no reasonable jury could find in Plaintiff's favor against Dr. White and McCullough, both are entitled to summary judgment. Disputes of fact remain, however, as to Plaintiff's claims against the remaining Defendants, so the balance of the summary judgment motions will be denied.

## FACTUAL BACKGROUND[1]

Plaintiff Omar Wesley suffers from schizophrenia, severe schizoaffective disorder, and antisocial personality disorder. (ECF No. 213 at 19.) In November of 2013, while experiencing auditory hallucinations, he entered a U.S. Bank in downtown Milwaukee and finessed the teller into surrendering a packet of money. (ECF No. 219 at 6.) Milwaukee County subsequently charged him with robbery of a financial institution. (*Id.* at 6-7.) But because of his severe mental illness, Plaintiff was found incompetent to stand trial and admitted to the Mendota Mental Health Institute (Mendota) for attempted competency restoration. (*Id.* at 7.)

On December 1, 2015, after other medications had failed, providers at Mendota started Plaintiff on clozapine, a powerful psychotropic drug. (ECF No. 207 at 30.) According to his mother, Brenda, Plaintiff responded well and was able to laugh and have meaningful conversations. (*Id.*) On February 3, 2016, Dr. Lesley Baird concluded that the clozapine regimen had restored Plaintiff to competency. (ECF No. 213 at 20-21.) Plans were then made to transfer him to either the Milwaukee County Jail (the Jail) or Milwaukee County House of Corrections (House of Corrections) while he awaited trial on his robbery charge. (*Id.* at 21-25.)

Both the Jail and House of Corrections are subject to the 2001 "*Christensen* Consent Decree," which Milwaukee County entered into to settle a class action lawsuit brought by inmates alleging various constitutional deprivations related to medical care. (*Id.* at 2.) Under the decree, the Milwaukee County Circuit Court retained jurisdiction over the County while it worked to remedy certain deficiencies in its provision of carceral healthcare. (*Id.*) To help ensure compliance, Dr. Ronald Shansky was appointed as "medical monitor," tasked with filing regular reports assessing the County's progress and providing recommendations. (*Id.* at 2-3.) Unfortunately for all, progress appears to have been slow going. By 2006, the circuit court had identified and established nearly 17,000 continuing violations. (*Id.*) At some point between 2013 and 2016, with the decree still in effect, Milwaukee County contracted with Armor "to obtain reasonably necessary health care" for detainees and inmates at the Jail and House of Corrections. (ECF No. 216 at 4-5.) Under this contract, operative during Plaintiff's incarceration, Armor agreed

---

[1] These facts are drawn from the parties' responses to proposed findings of material facts. (ECF Nos. 207, 213, 216, 219, 226, & 231.) Defendants do not always agree on the validity of Plaintiff's proposed facts. (*Compare* ECF No. 207 at 5-6, *with* ECF No. 213 at 3.) As a result, some disputed facts may appear in this section for the purpose of building a coherent narrative, but disagreements will be noted and accounted for as relevant to the Court's final analysis.

to "provide all medical, dental, mental health, technical and support staff for rendering health care services" at the Jail and House of Corrections. (*Id.* at 6.)

On February 23, 2016, Plaintiff was transferred from Mendota to the House of Corrections. (ECF No. 213 at 25.) From that date until April 6, 2016, Kim Wolf, a psychiatric nurse practitioner and Armor employee, managed Plaintiff's medications. (ECF No. 207 at 37.) During this period, Plaintiff received 12,625 out of a prescribed 12,900 mg of clozapine. (ECF No. 183 at 10-12.) Also during this period, Dr. John Pankiewicz observed Plaintiff and opined: "I believe Mr. Wesley's psychiatric condition is stable" and "I do believe to a reasonable degree of medical certainty he could be maintained in the community if on a set of very specific conditions." (ECF No. 213 at 33.)

On April 6, 2016, Plaintiff was transferred from the House of Corrections to housing unit 4C at the Jail, which is reserved for inmates with severe mental health issues. (ECF No. 213 at 45.) From that date until June 28, 2016, Deborah Mayo, a psychiatric nurse practitioner and independent contractor working for Armor, managed Plaintiff's medications. (*Id.* at 46; ECF No. 226 at 4.) During this period, Plaintiff received at most 23,890 mg of the 26,700 mg of clozapine he was prescribed. (ECF No. 183 at 12-13.)

On June 6, 2016, Plaintiff appeared before Milwaukee County Circuit Court Judge William Pocan on his pending robbery charge. (ECF No. 207 at 50.) Based on Dr. Pankiewicz's recommendation, Judge Pocan found Plaintiff not guilty by reason of mental disease or defect and ordered the Department of Health Services (DHS) to prepare a conditional release plan. (*Id.*) On June 24, 2016, while awaiting release, Plaintiff's clozapine prescription expired and was not renewed. (ECF No. 213 at 39.) On June 28, 2016, consistent with DHS's plan, Plaintiff was released from the Jail to Wisconsin Community Services, Inc. (WCS), which placed him at Hills of Love, a community-based residential treatment facility. (ECF No. 219 at 13.) At the time of his release, Plaintiff had not received any clozapine for at least four days. (ECF No. 207 at 54.) For reasons that are unclear, he was also improperly denied a medication voucher, which would have allowed him to obtain a seven-day supply of his medications from an outside pharmacy. (*Id.*)

On June 30, 2016, Plaintiff saw WCS psychiatrist Dr. Michael Ewing, who noted that Plaintiff's clozapine "had been stopped two weeks previously while he was housed in the Milwaukee County Jail." (*Id.* at 55.) According to Dr. Ewing, he did not immediately reorder clozapine because he did not know why it had been discontinued—the drug can produce serious

side effects that make prolonged use dangerous. (ECF No. 199 at 2.) On July 8, 2016, once he'd confirmed that the Jail had not intentionally paused Plaintiff's treatment for any legitimate medical purposes, Dr. Ewing prescribed a titrated schedule of clozapine. (*Id.* at 2-3.) As it relates to psychotropic medication, titration refers to the process by which a patient's dosage is started at a sub-therapeutic level and gradually increased over time to limit exposure to serious side effects. Titration is only necessary when a drug is first introduced or when it is reintroduced following a protracted interruption. (ECF No. 219 at 32-33.) Plaintiff took his prescribed clozapine doses on July 8, 2016 but refused to do so on the following two days. (ECF No. 226 at 17-18.) On July 13, 2016, because his refusal to take medication violated the terms of his conditional release, Plaintiff was transferred back to the Jail and his community supervision was temporarily revoked pending a hearing. (*Id.* at 18-19.) He did not receive another dose of clozapine for the next eight days: until July 21, 2016. (*Id.* at 20.)

On July 26, 2016, Dr. Maureen White, Armor's Director of Mental Health for both the Jail and House of Corrections, emailed Armor's Director of Nursing Courtney Holifield and Armor's Health Services Administrator Kayla McCullough to inform them that she had received a subpoena "due to us not providing [Plaintiff] his medication the last three days of his last incarceration." (ECF No. 195-67 at 1.) She also wrote: "I am looking at his chart now and he missed several days with 'absent' on the [Medication Administration Record]." (*Id.*) In response, Holifield completed and signed an Unusual Occurrence Report, indicating that Plaintiff had not received his clozapine on July 25, 2016 because the medication was "absent." (ECF No. 195-65.) McCullough also signed the report. (*Id.*) On July 27, 2016, Nurse Mayo noted on Plaintiff's medical chart that he took his morning clozapine dose less than half (only 44%) of the time. (ECF No. 207 at 64.) In her notes for July 29, 2016, Mayo wrote that Plaintiff "admits to having some delusional thoughts." (*Id.* at 65.) According to Mayo, Plaintiff had stated, "I am not real sure what is real sometimes," said that he had "talked to this lady called Hillary Clinton," and had "been hearing things like these Dudes in here are going to get murdered." (*Id.*) Chart notes dated August 1, 2016, characterized Plaintiff as "disorganized with tangential speech." (*Id.* at 65-66.) On August 8, 2016, Psychiatric Social Worker Iesha Sanders stated that Plaintiff "appeared paranoid throughout his housing assessment." (ECF No. 207 at 68.) From July 26, 2016 through the end of his incarceration, Plaintiff continued to take clozapine only irregularly, sometimes based on the medication's absence and sometimes based on his own refusal. (ECF No. 219 at 33-35; ECF No. 192 at 19.)

On August 9, 2016, Judge Pocan denied the State's petition to revoke Plaintiff's community supervision, finding that he did not willfully refuse to take his medication and that it "was an error made by the jail that . . . set [him] up for failure." (ECF No. 195-42 at 40.) Plaintiff was released from the Jail the next day but returned six days later following an incident at a community group home. (ECF No. 207 at 70-71.) While he was away, at McCullough's request, (ECF No. 195-67 at 2), Holifield authored a "Corrective Action Plan," which stated that the root cause of Plaintiff's missed clozapine doses was: "Failure of medication LPNs to monitor medication compliance rate; failure in the process of running the medication cart; failure to follow policy related to missing medication." (ECF No. 195-66.) Despite this Corrective Action Plan, Plaintiff continued to miss doses of clozapine upon his return. (ECF No. 192 at 19.) On August 26, 2016, because he now posed a significant threat of bodily harm to himself or others, Plaintiff was transferred back to Mendota pursuant to Wis. Stat. Section 971.17(3). (ECF No. 207 at 74.) At the time of his recommitment, he had a sub-therapeutic level of clozapine in his blood. (*Id.* at 75.) He has not achieved competency again since. (*Id.*)

## LEGAL STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

Plaintiff's claims fall into three categories: (1) *Monell* claims under 42 U.S.C. Section 1983 against both the County Defendants and Armor Correctional Health Services, Inc.; (2) claims against individual Defendants Dr. White, McCullough, Holifield, Wolf, and Mayo for deliberate indifference to a serious medical need; and (3) claims against those same individual Defendants for negligence. Plaintiff has moved for summary judgment as to all Defendants save Mayo. Defendants, including Mayo, have also moved for summary judgment on all claims. Because no reasonable jury could find Dr. White or McCullough liable on any claim, their motions for

summary judgment will be granted. Persisting disputes of fact make summary judgment inappropriate as to all other claims, however, and the remaining motions will be denied.

I.      **The Record Precludes Resolution of Plaintiff's *Monell* Claims at Summary Judgment.**

Section 1983 affords injured parties a cause of action against "[e]very person who, under color of [state law] . . . subjects or causes . . . the deprivation of any rights, privileges, or immunities secured by the Constitution." In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court recognized local governments can be "persons" for purposes of Section 1983 suits in certain circumstances. To hold a local government liable under Section 1983, a plaintiff must prove: (1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policymaking authority; (2) culpability, meaning, at a minimum, deliberate conduct; and (3) causation, which means the municipal action was the motivating force behind the constitutional injury. *See Bd. of County Comm'rs. of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 403-04 (1997). Further, "[p]rivate corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices." *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012)).

In this case, Plaintiff's *Monell* claims seek to hold Milwaukee County (a local government) and Armor (a private corporation acting under color of state law) liable for injuries he suffered while incarcerated at the Jail and House of Corrections. All parties have moved for summary judgment, but because disputes of fact remain, their motions will be denied.

A.      **Plaintiff Can Only Prevail Against the County by Holding it Responsible for a Policy that Armor Adopted.**

For purposes of *Monell*, a Plaintiff may challenge a municipality's unconstitutional action only if based on: (1) an express policy; (2) a widespread practice or custom; or (3) an act by an individual with final policymaking authority. *See Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) (citing *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)). Plaintiff's claim relies on the second type of conduct: a widespread practice or custom. (ECF No. 152 at 2.) Specifically, he asserts that Milwaukee County adopted an unconstitutional, widespread practice or custom of ignoring the psychiatric needs of mentally ill individuals in its custody. (ECF No. 192 at 5.) To hold Milwaukee County liable under this theory, Plaintiff "must show that County policymakers were 'deliberately indifferent as to the known or obvious consequences'" of their de facto practice or custom. *Thomas v. Cook Cnty. Sheriff's Department*, 604 F.3d 293, 303

(7th Cir. 2010) (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)).  But "[i]t is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once."  *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).  Rather, he must proffer "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Id.*

### 1. Plaintiff Cannot Use Inadmissible Evidence to Prove the County Acquiesced to an Unconstitutional, Widespread Practice or Custom.

The County Defendants argue that Plaintiff's claim fails as a matter of law because he relies solely on inadmissible evidence to establish the pervasiveness of the unlawful practice alleged.  They take particular issue with his citation to the *Christensen* Consent Decree and Shansky reports as bases for proving that the County acceded to a widespread practice of ignoring the needs of mentally ill inmates.  (ECF No. 215 at 15-18.)

According to the County Defendants, "'a consent decree, like any settlement, is inadmissible under Federal Rule of Evidence 408.'"  *Meyer v. Ward*, No. 13-C-3303, 2017 WL 1862626, at *2 (N.D. Ill. May 9, 2017) (quoting *Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, No. 1:02-cv-1014-LJM-VSS, 2006 WL 2644935, at *6 (S.D. Ind. Sept. 14, 2006)).  Rule 408 prohibits the use of, among other things, settlement agreements "to prove or disprove the validity or amount of a disputed claim."  Fed. R. Evid. 408(a).  In *Meyer*, citing Rule 408, the Northern District of Illinois refused to admit evidence of an SEC Consent Decree to prove the truth of the matters asserted therein.  *Meyer*, 2017 WL 1862626, at *2.

Plaintiff frames *Meyer* as a limited decision, recognizing only that Consent Decrees *involving the SEC* are settlement agreements under Rule 408.  (ECF No. 215 at 15.)  As a district court ruling, *Meyer* is not binding precedent, but its reasoning is sound, and the Court finds it persuasive.  Many courts have in fact applied both Rule 408 and the logic embraced by *Meyer* in cases that have nothing to do with the Securities and Exchange Commission.  *See, e.g.*, *Africano v. Atrium Medical Corp.*, No. 17-cv-7238, 2021 WL 4477867, at *2 (N.D. Ill. Sept. 30, 2021) (holding a consent decree between the defendant and the FDA was an inadmissible settlement under Rule 408); *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15-C-1164, 2018 WL 10609658, at *2 (N.D. Ill. Apr. 2, 2018) (noting that a consent decree between the defendant and the CFPB would be inadmissible "to prove or disprove the validity or amount of a disputed claim" under

Rule 408).  The rationale undergirding *Meyer*, *Paul Harris*, *Africano*, and *Saccameno* applies here. Milwaukee County entered the *Christensen* Consent Decree to settle with a class of aggrieved inmates, not to provide future *Monell* litigants a handy shortcut.  The consent decree, of course, establishes the existence of constitutional deficiencies *at the time of its execution*, and it also holds under general scrutiny the County's provision of carceral healthcare.  But "[t]he fact that the [County] is under general scrutiny concerning the provision of medical care cannot serve as the hook for any later *Monell* claim also touching on medical treatment."  *Terry v. County of Milwaukee*, No. 17-cv-1112-JPS, 2018 WL 2567721, at *9 (E.D. Wis. June 4, 2018).

At the same time, there is no dispute that Plaintiff may introduce the *Christensen* Consent Decree to prove notice.  *See United States v. Austin*, 54 F.3d 394, 400 (7th Cir. 1995) (permitting introduction of a consent decree to show notice); Fed. R. Evid. 408(b) ("The court may admit [evidence of settlement] for another purpose.").  But "evidence admitted only for notice cannot establish that a municipality acted with deliberate indifference unless the plaintiff also has substantive proof that the 'noticed' problems actually existed."  *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 238 (7th Cir. 2021).  In other words, while Plaintiff can use the *Christensen* Consent Decree to show that the County Defendants were on notice of problems at the Jail and House of Corrections, he still must establish the existence of those noticed problems as a separate proposition.

Dr. Shansky's reports are of little help in this endeavor.  In *Daniel v. Cook County.*, 833 F.3d 728, 743 (7th Cir. 2016), the Seventh Circuit held that reports Dr. Shansky authored pursuant to an "Agreed Order" constituted inadmissible hearsay if introduced to prove the truth of the matters asserted.  The Court did acknowledge that the reports "may be admissible to show that the defendants were on notice of their contents," *id.*, but, as *Dean* makes clear, evidence admitted only for notice cannot also prove the existence of the noticed problems.

Plaintiff counters with five reasons he believes the Court must admit Dr. Shansky's reports for the truth of the matters asserted.  None of his arguments can be squared with a proper application of the hearsay rule.

Plaintiff first argues that the reports fall within the definitional exclusion for statements by a party opponent expressly baked into Rule 801(d)(2)(C).  (ECF No. 215 at 16.)  Under that Rule, a statement is not hearsay when it is an opposing party's statement, offered against the opposing party, and "was made by a person whom the party authorized to make a statement on the subject."

Fed. R. Evid. 801(d)(2)(C). According to Plaintiff, "[p]ursuant to the *Christensen* Consent Decree, Milwaukee County specifically authorized Dr. Shansky to investigate and issue reports to the Milwaukee County Circuit Court concerning the provision of healthcare at the Milwaukee County Jail." (ECF No. 215 at 16.) Therefore, in his reports, Dr. Shansky functionally spoke on behalf of Milwaukee County, and anything he wrote should be admissible as an opposing party statement. The County Defendants respond that there is no evidence that the County authorized Dr. Shansky to "speak on [its] behalf." (ECF No. 222 at 5) (citing *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 583 (7th Cir. 2019)). The dispute essentially turns on whether the consent decree deputized Dr. Shansky as an agent of the County. On this matter, provision I.A. is instructive: "Nothing in this consent decree shall be used as evidence of a constitutional violation in any other matter." (ECF No. 179 at 4-5.) That language belies Plaintiff's characterization of Dr. Shansky as the County's authorized mouthpiece, at least as relevant here. If nothing in the consent decree could be used as evidence of a constitutional violation in another matter, then the County had no reason to believe that entering the consent decree would involve authorizing Dr. Shansky to speak on potential constitutional violations in future cases. The County undoubtedly authorized Dr. Shansky's reports, but it did not grant him carte blanche to act as its surrogate. Nor did anything in the decree permit Dr. Shansky to speak on the County's behalf about constitutional violations *in other cases*.

The same logic vitiates Plaintiff's second argument, that Dr. Shansky's reports represent adoptive admissions pursuant to Rule 801(d)(2)(B). Under that Rule, an opposing party's statement can only be introduced for the truth of the matter asserted if the opposing party manifested its adoption or belief in the truth of the statement in question. *See Moffett v. McCauley*, 724 F.2d 581, 586 (7th Cir. 1984). Plaintiff argues that the consent decree provided a mechanism for challenging any disputed portion of Dr. Shansky's reports, and because it did not use this mechanism, the County implicitly recognized the truth of everything contained in those reports. (ECF No. 215 at 16.) But, again, the consent decree, on its face, precluded the use of Dr. Shansky's reports to establish a constitutional violation in another case. The idea that the County, by failing to invoke the dispute resolution mechanism, passively adopted a belief in the truth of Dr. Shansky's findings for purposes of Rule 801(d)(2)(B) runs directly counter to provision I.A., which explicitly prohibited the introduction of those findings to prove a constitutional violation in a case like this.

The County was entitled to rely on that contractual guarantee. It did not need to challenge the reports to avoid manifesting a belief in their truth; provision I.A. had already taken care of that.

Plaintiff's third argument posits that Dr. Shansky's reports can be introduced to show their effect on the listener (the County Defendants). (ECF No. 215 at 17); *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) ("Statements introduced to show their effect on the listener . . . are not hearsay."). This is but another method for establishing that the County Defendants were on notice. Plaintiff's problem is that he has not produced evidence proving the existence of the noticed problems, and this effect-on-the-listener exception does nothing to remedy that.

Plaintiff's fourth argument is that Dr. Shansky's reports are excepted from the definition of hearsay because they constitute records of a regularly conducted activity under Rule 803(6). (ECF No. 215 at 17.) The Seventh Circuit has already rejected this argument. In *Daniel*, the Court held that similar reports were "crafted with care for the court and parties based on scheduled visits to the Jail." *Daniel*, 833 F.3d at 743. There was no evidence that the reports were drafted at the time of Dr. Shansky's observations, as required by Rule 803(6)(A). There is a similar lack of such evidence here.

Fifth and finally, Plaintiff states that a district court may consider inadmissible evidence at summary judgment so long as it would be possible to present the evidence in admissible form at trial. (ECF No. 215 at 17-18); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). But the Seventh Circuit is clear that district courts may not consider inadmissible hearsay at summary judgment. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n.3 (7th Cir. 2021). Because Plaintiff has not established the application of any hearsay exception that would render Dr. Shansky's reports admissible for the truth of the matters asserted at trial, the Court may not consider those reports at summary judgment.

In sum, Plaintiff lacks admissible evidence supporting his claim that the County Defendants knew of and condoned a widespread practice or custom of ignoring the needs of mentally ill inmates.

### 2. Plaintiff Can Hold the County Liable for Armor's Unconstitutional, Widespread Practices or Customs.

Failed hearsay gambit to one side, the County is not off the hook just yet. Plaintiff also argues that he can hold the County Defendants liable under *Monell* for widespread practices or

customs adopted by Armor, the private entity the County contracted with to provide medical services at the Jail and House of Corrections. This argument has merit.

The government's duty to provide medical care to those in its custody is non-delegable. *See West v. Atkins*, 487 U.S. 42, 56 (1988). Therefore, as the Seventh Circuit has made plain, a municipality "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012). A private entity's "policy becomes that of the County if the County delegates final decision-making authority to it." *Id.* Simply put, authority can be delegated, but responsibility cannot.

It is undisputed that, as part of the contract with Armor, Milwaukee County ceded decision-making authority over medical decisions to Armor and its staff. (ECF No. 207 at 22-23.) And the law is clear that a municipality cannot contract around its duty to furnish adequate healthcare to inmates. Thus, to the extent that Armor adopted any unconstitutional, widespread practices or customs, those practices or customs are imputed to the County Defendants—they may not evade responsibility through shell games. Resolution of the County's summary judgment motion, then, depends on the outcome of Armor's.

### B. Neither Party is Entitled to Summary Judgment on Plaintiff's *Monell* Claim Against Armor.

To summarize, *Monell* liability requires: (1) municipal action; (2) culpability; and (3) causation. *See Brown*, 520 U.S. at 403-04. Plaintiff has sufficient evidence of all three elements to defeat summary judgment here. But that evidence is disputed, so Plaintiff's own bid for summary judgment must, therefore, also be denied.

#### 1. There is Enough Evidence for a Reasonable Jury to Find Municipal Action.

As discussed earlier, Plaintiff can introduce the *Christensen* Consent Decree and Dr. Shansky's reports to demonstrate that Armor (and by proxy the County) had notice of the Jail's and House of Correction's failure to ensure the regular availability and delivery of psychotropic medications. To proceed, however, Plaintiff must also present evidence that proves those alleged unconstitutional shortcomings actually occurred. Armor argues that he cannot do so. (ECF No. 183 at 14-17.)

When considering whether a practice is sufficiently pervasive to constitute municipal action, a court should "look to see if a trier of fact could find 'systemic and gross deficiencies in staffing, facilities, equipment, or procedures' in a detention center's medical care system." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *Wellman v. Faulkner*, 715 F.2d 269,

272 (7th Cir. 1983)). In the realm of prison healthcare, the Seventh Circuit has "not adopted bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (citation omitted). But "proof of isolated acts of misconduct will not suffice." *Palmer v. Marion County.*, 327 F.3d 588, 596 (7th Cir. 2003).

Armor's position is that Plaintiff has, at most, identified "isolated acts of misconduct" with respect to his own receipt of clozapine. (*See* ECF No. 223 at 1-9.) He cannot, it insists, rely on these few acts to establish a widespread practice under Seventh Circuit law. (*Id.*) Armor understates the record, which is replete with testimony that might support finding a widespread failure to deliver psychotropic drugs. For instance, Nurse Caryanne Adriano stated "it would happen a lot," meaning daily, when asked if there were times that patients in Unit 4C did not receive their psychotropic medication because it was unavailable. (ECF No. 195-21 at 50:21-51:4.) She also agreed that Armor policy required "LPNs and RNs . . . to monitor adherence to the delivery of psychotropic medications and to notify health care providers [of any problems]," but stated, in her experience, that did not occur. (*Id.* at 127:5-13.) And she acknowledged that, because it happened so often, Armor did not treat the fact that an inmate had missed three or more doses of medication in a seven-day period as "an emergency situation." (*Id.* at 165:12-18.) Psychiatric Social Worker Iesha Sanders testified that "there have been times when" a corrections officer told her that a patient missed three or more doses of their prescribed medication in a seven-day period. (ECF No. 195-28 at 51:4-8.) While this is hearsay if introduced to prove the truth of the corrections officer's statements, Sanders also said that she and her team would sometimes "discuss why an inmate was missing . . . medication." (*Id.* at 54:5-6.) That validates the existence of missed doses and is not hearsay. Like Sanders, Psychiatric Nurse Practitioner Deborah Mayo (a defendant in this suit) testified that she was "frequently notified" that inmates had missed three or more doses of their prescribed medications in a seven-day period. (ECF No. 195-22 at 35:16-21.) And as with Sanders, Mayo confirmed, from her personal knowledge, the truth of those missed doses. (*Id.* at 36:21-37:23.)

A reasonable factfinder could view this as sufficient to corroborate the problems noticed in Dr. Shansky's reports. He specifically warned that flaws in Armor's policy would make it difficult to provide "adequate quality services on a timely basis." (ECF No. 195-5 at 5.) The testimony of Adriano, Sanders, and Mayo suggests that quality service was not, in fact, provided

on a timely basis and that gross and systemic deficiencies existed. Thus, if believed, the foregoing testimony permits the inference that Armor, the County's agent, embraced a widespread practice sufficient to satisfy the municipal action of *Monell* liability. As a result, neither the County nor Armor is entitled to summary judgment on this ground.

### 2. There is Enough Evidence for a Reasonable Factfinder to Adjudge Armor Culpable.

Armor next argues that, even if Plaintiff can show municipal action, he cannot satisfy the culpability requirement. To do so, a *Monell* plaintiff must identify deliberate conduct that precipitated an alleged constitutional violation. *Brown*, 520 U.S. at 404. In a case like this one, the "key is whether there is a conscious decision not to take action." *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017). A "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989)). Thus, the question here is whether the record would permit a reasonable factfinder to believe that Armor decided not to act despite notice that its practices would cause constitutional violations.

First, Plaintiff must prove that a constitutional right is at issue. The Eighth Amendment establishes that the government accepts the "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The government, therefore, violates the Eighth Amendment when it evinces "deliberate indifference to serious medical needs of prisoners." *Id.* at 104. But this standard applies only to convicted prisoners. For pretrial detainees, which Plaintiff was during at least part of his incarceration, the Fourteenth Amendment Due Process Clause governs. *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). "The protections of [that clause, though,] are at least as broad as those that the Eighth Amendment affords to convicted prisoners." *Rice*, 675 F.3d at 664, *abrogated on other grounds by Kemp v. Fulton Cnty.*, 27 F.4th 491 (7th Cir. 2022). So regardless of whether Plaintiff was a convicted prisoner or a pretrial detainee, the law imposed on Armor a constitutional duty to attend to his medical needs during his period of incarceration.

With the constitutional dimension of his claim confirmed, Plaintiff confronts the more difficult challenge of demonstrating "that it was obvious that [Armor's] action would lead to constitutional violations and that [Armor] consciously disregarded those consequences." *Dean*, 18 F.4th at 235 (quoting *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*,

988 F.3d 978, 987 (7th Cir. 2021)). Relevant here, the Seventh Circuit has "observed that 'in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.'" *Glisson*, 849 F.3d at 381 (quoting *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990)); *see also Thomas*, 604 F.3d at 303 ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, [a] [c]ounty's failure to make a policy is also actionable.").

While culpability is a high bar, the record contains enough evidence for a reasonable jury to find that Plaintiff has cleared it. Armor argues that Plaintiff cannot show that it had knowledge of the unavailability of psychotropic medications because no concerns on that topic were ever raised at its monthly meetings. (ECF No. 219 at 44-45.) But the communication of such concerns was not restricted to those monthly meetings. For instance, in July of 2016, Dr. White, Armor's Director of Mental Health, sent an email to Director of Nursing Holifield and Health Services Administrator McCullough in which she referenced Plaintiff's "absent" clozapine doses. (ECF No. 213 at 51.) Holifield later filled out an "Unusual Occurrence Report," (which McCullough signed) that stated that Plaintiff had missed doses of clozapine because it was "absent." (ECF No. 195-65.) And she created a "Corrective Action Plan" where she wrote that the root cause of Plaintiff's failure to receive his medication was "[f]ailure . . . to monitor medication compliance rate; failure in the process of running the medication cart; failure to follow policy related to missing medication." (ECF No. 195-66.) This is all consistent with the testimony of Adriano, Sanders, and Mayo, who each reported that inmates frequently missed doses of their psychotropic medications. Yet despite Armor officials' apparent knowledge of this defect in the provision of healthcare, Plaintiff continued to miss doses until he finally decompensated. (ECF No. 213 at 53-58.) On these facts, a reasonable jury could find Armor (and the County) culpable because Armor chose not to act in the face of obvious, repeated constitutional violations.

### 3. There is Enough Evidence for a Reasonable Factfinder to Conclude that Armor's Inaction Was the "Moving Force" Behind a Constitutional Violation.

As a last resort, Armor suggests that Plaintiff cannot meet the *Monell* causation requirement because he cannot establish that Armor's failure to regularly deliver his medication led to his decompensation. After establishing municipal action and culpability for a federal-rights violation, a *Monell* "plaintiff must show that the municipal action was 'the "moving force" behind the federal-rights violation.'" *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 987). "This 'rigorous causation standard' requires 'a "direct causal link" between the challenged municipal

action and the violation of the plaintiff's constitutional rights.'" *Id.* (quoting *LaPorta*, 988 F.3d at 987.)

Plaintiff compares this case to *Glisson* where the Seventh Circuit held that "[a] jury could . . . conclude that [the defendant] had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless 'adopted a policy of inaction.'" 849 F.3d at 382 (quoting *King*, 680 F.3d at 1021). But Armor contends that unlike the plaintiff in *Glisson*, Plaintiff here lacks evidence showing that its inaction *caused* his injury. Specifically, Armor relies on the fact that: (1) Plaintiff received *most* of his prescribed medication while incarcerated; and (2) during the last month of his incarceration, Plaintiff refused his dose of clozapine eight times. (ECF No. 183 at 9-17; ECF No. 219 at 35.)

As to the first argument, Armor cannot, without any foundation, treat the dispensation of psychotropic medications like a game of horseshoes. According to Plaintiff's expert, Dr. Schoenecker, close is not good enough. In his report, he concluded that, on Armor's watch, Plaintiff missed too many clozapine doses, which "led to his suffering, decompensation and re-commitment to [Mendota]." (ECF No. 198-2 at 13.) It is true that Armor's expert, Dr. Steven Hanus, testified that Plaintiff "did not decompensate because of a lapse in [clozapine]." (ECF No. 220 at 43.) But a battle of the experts is not properly resolved at summary judgment. *See Vollmert v. Wis. Dep't of Transp.*, 197 F.3d 293, 298 (7th Cir. 1999) (noting that competing, valid expert reports create disputes of fact and preclude summary judgment).

With respect to Armor's other argument, it is undisputed that Plaintiff refused his clozapine eight times in August 2016, but what matters for causation is why he did so. Plaintiff's clozapine dose was titrated during the months of July and August 2016. (ECF No. 218 at 4.) This means, over that period, he received something less than a therapeutic 300 mg daily dose. And titration was only necessary because Armor allowed Plaintiff's prescription to lapse in late June. (*Id.* at 5 n.4.) Plaintiff's position is that, throughout July and August 2016, his condition deteriorated because (in the event he received any clozapine at all) it came in a sub-therapeutic dose. No longer fully competent, he began refusing his medication when he otherwise would not have. The blame for this, in Plaintiff's view, falls at Armor's feet because its blunders created the need for titration, which left Plaintiff in a compromised condition, unable to make rational choices. This is at least a plausible story. According to Dr. Schoenecker, had Armor behaved appropriately, there would

have been no reason to titrate Plaintiff's clozapine. (ECF No. 195-30 at 106:9-107:3.) And the record shows that, at the time he left the Jail, Plaintiff was delusional, with a sub-therapeutic level of clozapine in his blood. (ECF No. 207 at 75.) A reasonable jury could, therefore, conclude that Armor's "policy of inaction" caused Plaintiff's decompensation.

Because a jury could find that Plaintiff satisfied all three elements of his *Monell* claim against Armor, that claim must proceed to trial. That is unsurprising considering how neatly the facts here map onto prior caselaw. *See Clark v. Haynes*, No. 18-cv-809-JPS, 2020 WL 1324496, at *6 (E.D. Wis. Mar. 20, 2020) (finding a genuine issues of material fact where a plaintiff did not receive his psychotropic medication for at least two days); *King*, 680 F.3d at 1016, 1019 (holding that failure to provide detainee with full doses of medication over a four-day period when risk of withdrawal was known was sufficient to deny summary judgment); *Reed v. McBride*, 178 F.3d 849, 856 (7th Cir. 1999) (reversing a grant of summary judgment based on three to five days' deprivation of food and medicine); *Davis v. Carter*, 452 F.3d 686, 689-92, 695 (7th Cir. 2006) (allowing *Monell* claim to proceed to trial because the evidence indicated the plaintiff was deprived of his methadone medication for six days). Additionally, because Milwaukee County delegated decision-making authority over medical decisions to Armor, Armor's liability is imputed to the County, so Plaintiff's *Monell* claim against the County must also go before the jury. Accordingly, all three motions for summary judgment on the *Monell* claims will be denied.

## II. Summary Judgment Is Inappropriate on Plaintiff's Inadequate Medical Care Claims Against All Individual Defendants Other than Dr. White and McCullough.

In addition to his *Monell* claims against the institutional actors, Plaintiff brings claims alleging failure to provide adequate medical care against five individuals: Armor's Director of Mental Health Dr. Maureen White, Armor's Health Services Administrator Kayla McCullough, Armor's Director of Nursing Courtney Holifield, Armor Psychiatric Nurse Practitioner Kim Wolf, and independent contractor and Psychiatric Nurse Practitioner Deborah Mayo.

At the outset, the parties dispute whether it is the Eighth or Fourteenth Amendment that governs these claims. Mayo argues that only the Eighth Amendment applies. (ECF No. 187 at 5.) The Armor Defendants argue that the Fourteenth Amendment applies prior to June 6, 2016—when Plaintiff was a pretrial detainee—but the Eighth Amendment applies thereafter because Plaintiff executed a "Waiver of Rights," which is akin to a conviction. (ECF No. 183 at 17.) And Plaintiff argues that the Fourteenth Amendment governs the entire case. (ECF No. 192 at 20-21.) While Mayo's position is indisputably incorrect, *see Miranda*, 900 F.3d at 351, there is no caselaw that

conclusively determines whether a "Waiver of Rights" that leads to a not guilty by reason of insanity verdict is equivalent to a "conviction" that triggers the Eighth Amendment.

Determining the standard in this context is complicated because "[n]either the Supreme Court nor the Seventh Circuit has directly addressed whether it is the Eighth or Fourteenth Amendment that affords protection" after "a finding of not guilty by reason of insanity." *Nadzhafaliyev v. Hardy*, No. 16-C-6844, 2020 WL 7027578, at *6 (N.D. Ill. Nov. 30, 2020). In *Nadzhafaliyev*, the Court analogized commitment following an insanity acquittal to civil commitment more generally. *Id.* It determined that, as with typical civil commitment, the Fourteenth Amendment ought to apply to an individual committed after a finding of not guilty by reason of insanity because the purpose of such detention is "to treat, not to punish." *Id.* (citing *Jones v. United States*, 463 U.S. 354, 368 (1983) (noting that commitment following an insanity acquittal serves the same objectives as civil commitment)). This approach makes sense, especially given that the Eighth Amendment does not apply to even a criminal detainee until after conviction *and sentencing*. *See Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989); *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). Courts do not treat "commitment" as a "sentence." *See Baxstrom v. Herold*, 383 U.S. 107, 112-13 (1966) (explaining that a New York statute provided for civil commitment "upon expiration" of a sentence); *Gilbert v. McCulloch*, 776 F.3d 487, 489 (7th Cir. 2015) (repeatedly distinguishing between the plaintiff's sentence and commitment). Put another way, the Milwaukee County Circuit Court never imposed any "sentence" on Plaintiff, and unless and until it does, his status remains the equivalent of a pretrial detainee and thus subject to the Fourteenth Amendment.

Under the Fourteenth Amendment, a claim of inadequate medical care proceeds in two steps. *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018). The first step "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of" the plaintiff's objectively serious medical condition.[2] *Miranda*, 900 F.3d at 353; *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). The second step asks "whether the challenged conduct was objectively reasonable." *McCann*, 909 F.3d at 886. "This standard requires courts to focus on the totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—

---

[2] There is no question that Plaintiff's schizoaffective disorder constitutes a serious medical condition. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.* This is "'less demanding' than the [Eighth Amendment] deliberate indifference standard," which requires subjective awareness on the part of the defendant. *Nadzhafaliyev*, 2020 WL 7027578, at *6 (quoting *Smego v. Jumper*, 707 F. App'x 411, 412 (7th Cir. 2017)).

### A. With Respect to Dr. Maureen White and Health Services Administrator Kayla McCullough, Plaintiff Cannot Show Objectively Unreasonable Conduct.

Plaintiff contends that Dr. Maureen White and Health Services Administrator Kayla McCullough behaved objectively unreasonably when they failed to ensure the timely and regular delivery of his clozapine. Both Defendants dispute that they even knew of Plaintiff's missing doses, but the record casts at least some doubt on those cries of ignorance. For example, in an email dated July 26, 2016, Dr. White wrote that she had received a subpoena "due to us not providing [Plaintiff's] medication." (ECF No. 213 at 51.) In the same email, she also stated, "I am looking at his chart now and he missed several days with 'absent' on the [Medication Administration Record]," and "this individual needs to have his medication every day." (*Id.*) And as a recipient of that email, McCullough cannot deny knowledge of lapses in treatment. (ECF No. 195-67 at 1.)

That said, knowledge of inadequate medical care is not a constitutional violation; it is the response that matters. Here, both Dr. White and McCullough responded reasonably. When she learned of the lapses in Plaintiff's treatment, Dr. White alerted McCullough and Director of Nursing Courtney Holifield and emphasized the importance of steady ministration. (ECF No. 195-67 at 1.) This was a reasonable exercise, consistent with her position. She could not prescribe clozapine, nor was she responsible for its distribution. (ECF No. 219 at 9.) Plaintiff insists she should have done more and, under the circumstances, had a duty to intervene directly. This is a redux of an argument the Seventh Circuit rejected in *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009). In that case, the Court denied a plaintiff's Section 1983 claim that sought to hold prison officials liable "for not being ombudsmen." *Id.* at 595. The Court found that prison staff were entitled to rely on the prison's division of labor, and they need not perform a job assigned to another to avoid legal exposure. *Id.* In this case, Dr. White was not one of Plaintiff's direct care providers, did not supervise the medical staff or the nurses who distributed medications, and had no duty personally to ensure that individual inmates received their daily medications. (ECF No. 213 at 22.) The law did not require her to assume any of those responsibilities. "[N]o prisoner is entitled to insist that one employee do another's job." *Burks*, 555 F.3d at 595. While Dr. White's

email may have proved inadequate, it was not an unreasonable response given the totality of facts and circumstances.

But Plaintiff persists, citing Dr. Schoenecker's expert report where he opined that the "standard of care required Dr. White to . . . disciplin[e] Ms. Wolf and Ms. Mayo." (ECF No. 198-2 at 18.) Expert reproach aside, it is far from clear that Dr. White had a duty to discipline nurses she did not supervise. And, even if she did, Plaintiff identifies nothing to indicate that she failed to do so. (ECF No. 220 at 41.) Nor is it obvious that the absence of any after-the-fact discipline caused Plaintiff's alleged injury. Summary judgment is not the time to play coy with evidence. *See Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (holding that, at summary judgment, a party must "show what evidence it has that would convince a trier of fact to accept its version of events") (internal quotations and citations omitted). Dr. Schoenecker testified that "in the absence of evidence that something has occurred, my presumption is that it hasn't occurred." (ECF No. 220 at 41.) But courts rely on evidence, not conjecture, and a hired expert's personal presumption is not enough to create a genuine issue of fact about Dr. White's behavior. *See Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact.") (emphasis in original).

Lastly, Plaintiff argues that it was Dr. White's job to furnish a medication voucher as part of the release process, and the failure to do so warrants a finding of liability. (ECF No. 213 at 41.) But he assigns this duty to Dr. White based on McCullough's nebulous speculation. When asked if she was involved in release planning at Armor, McCullough testified, "I would have to defer to the mental health director [Dr. White]." (ECF No. 213 at 41-42.) She elaborated: "Potentially, it could also be in a policy and procedure. Potentially, I'm assuming, but I don't know offhand. . . . If that was part of the release planning, then I would have to defer to [the mental health director] on the specifics." (*Id.* at 42.) Nothing in this testimony confirms that Dr. White was responsible for medication vouchers. At best, McCullough implicated Dr. White in the release planning process, assuming certain preconditions, which Plaintiff has not proven existed. This is insufficient at summary judgment.

Plaintiff's claim against McCullough fails for similar reasons. According to Dr. Schoenecker, when McCullough learned of lapses in Plaintiff's medical care, she should have taken immediate action. (ECF No. 198-2 at 18.) Such action would involve supervising and monitoring the delivery of medications and disciplining nurses, providers, and directors. (*Id.*) This

is a wish list, not a job description. McCullough's duties included facilitating communication between directors and overseeing training. (ECF No. 185-4 at 16:6-13, 27:6-9.) Plaintiff is not free to insist that she respond to his problems with acts outside the scope of her employment. *See Burks*, 555 F.3d at 595. And regardless of what McCullough's responsibilities were, the question is whether the record would permit a reasonable factfinder to hold her actions objectively unreasonable. Here, it would not. On August 2, 2016, McCullough emailed Holifield, the employee responsible for making sure nurses performed their jobs, and asked her to "check to make sure every day [Plaintiff] is getting his medication." (ECF No. 195-67 at 2.) One week later, she sent Holifield another email and asked her to draft a Corrective Action Plan to ensure that Plaintiff (and those similarly situated) did not miss medication doses again. (*Id.*) There is no lens through which this looks objectively unreasonable, so the claim against McCullough must be dismissed.

### B. Questions of Fact Remain with Respect to the Objective Reasonableness of the Actions of the Remaining Individual Defendants.

Plaintiff also asserts inadequate medical care claims against Director of Nursing Courtney Holifield and Psychiatric Nurse Practitioners Kim Wolf and Deborah Mayo. He contends all three violated his Fourteenth Amendment right to adequate medical care when they failed to ensure the timely and regular delivery of his clozapine. Unlike those brought against Dr. White and McCullough, the claims against these defendants raise questions of fact that must be resolved at trial.

With respect to Director of Nursing Holifield, Plaintiff claims she knew he needed his medication every day and was not receiving it but did nothing to rectify the situation. (ECF No. 192 at 22-23.) At her deposition, Holifield testified that, as the Director of Nursing, her responsibilities involved assigning jobs, including the delivery of psychotropic drugs, to Armor nurses and making sure those jobs were performed. (ECF No. 195-20 at 20:21-21:7, 21:16-19.) Plaintiff questions how diligently she pursued the latter. And the timeline of record supports his skepticism. In a July 26, 2016 email to Holifield, Dr. White emphasized that Plaintiff needed his medication every day and underscored that, according to his records, he had not received it several times because it was "absent." (ECF No. 195-67 at 1.) In response, Holifield completed an Unusual Occurrence Report, noting that the Medication Administration Record deemed Plaintiff's clozapine "absent," on July 25, 2016 (just one of the many days on which he did not receive his medication). (ECF No. 195-65.) She took no further action for 17 days. Only on August 12,

2016, after McCullough prompted her via email, did Holifield author a Corrective Action Plan. (ECF No. 195-67 at 2; ECF No. 195-66.) By this point, Plaintiff had, through no fault of his own, missed an additional four days of clozapine, (ECF No. 192 at 19; ECF No. 213 at 29-30), and was set for (what would prove to be a temporary) release. (ECF No. 207 at 70-71.) Inaction is a choice. *See Glisson*, 849 F.3d at 381. When that choice reflects a "wait and see" approach to medical care, a reasonable jury can conclude that the decisionmaker acted with purposeful, knowing, or reckless disregard for the consequences. *See Miranda*, 900 F.3d at 354. Considering her responsibilities and the facts she had at her disposal, a reasonable jury could conclude that Holifield's conduct, including her extreme delay in drafting a Corrective Action Plan, was objectively unreasonable. This claim must proceed to trial.

The case against Psychiatric Nurse Practitioner Kim Wolf is also sufficient to withstand summary judgment. Wolf admitted that her job duties included making sure that Plaintiff got his medication. (ECF No. 195-17 at 97:9-11.) And it is undisputed that, on her watch, Plaintiff received only 12,625 out of a prescribed 12,900 mg of clozapine (seven missed doses). (ECF No. 183 at 10-12.) Wolf and Armor characterize this as a glowing achievement. (*Id.* at 14.) Yet, per her own notation on Plaintiff's medical form, Wolf knew that Plaintiff would "decompensate[] quickly if 1 dose is missed of meds per Mark Phelps MD at Mendota." (ECF No. 213 at 27.) Plaintiff missed his first dose on February 24, 2016, his second day at the House of Corrections. (ECF No. 195-17 at 107:6-7.) Wolf addressed this issue with a "talk about medical compliance," an ostensibly reasonable response. (ECF No. 195-17 at 107:11-14.) But Plaintiff continued to miss doses on March 1, 3, 5, 6, 7, and 29. (ECF No. 183 at 11.) There is evidence that Wolf knew of this but took no subsequent action. She did not draft a Corrective Action Plan or fill out an Unusual Occurrence Report. (ECF No. 195-17 at 110:18-25.) She did not raise concerns at any staff meetings. (*Id.* at 116:21-117:3.) As with Holifield, a jury could find that Wolf's silence spoke volumes. Far from "diligently attend[ing] to [Plaintiff's] needs," *Williams*, 937 F.3d at 943, a rational factfinder might conclude that she ignored both the plaintiff and "the potential consequences of her actions." *McCann*, 909 F.3d at 887. Given the gravity of Plaintiff's medical condition, such inaction would constitute objectively unreasonable behavior.

But Wolf insists that because her involvement ended on April 6, 2016, she could not possibly be responsible for Plaintiff's decompensation. It is true that, to survive summary judgment on a claim for inadequate medical care, a plaintiff "must present evidence sufficient to

permit a jury to infer that the defendants' failure to act was a source of harm." *Ortiz v. City of Chi.*, 656 F.3d 523, 534 (7th Cir. 2011). Proximate causation is normally a jury question, but Wolf contends that this case presents "the rare instance" where "a plaintiff can proffer no evidence" of causation between the alleged unconstitutional act and the harm suffered. *Id.* Some evidence supports Wolf's position. For instance, on March 28, 2016 (just 9 days before Wolf's involvement ended), Dr. John Pankiewicz, opined: "I believe Mr. Wesley's psychiatric condition is stable" and "I do believe to a reasonable degree of medical certainty he could be maintained in the community if on a set of very specific conditions." (ECF No. 213 at 33.) And even Plaintiff's own expert, Dr. Schoenecker, testified that he is aware of no evidence of psychotic symptomology that overlaps with the period during which Plaintiff was under Wolf's care. (ECF No. 219 at 25.) But psychotic symptomology is often a lagging indicator. (*See* ECF No. 198-2 at 20.) Dr. Schoenecker's expert report reflects his belief that the clozapine doses Plaintiff missed while at the House of Corrections and under Wolf's care resulted in decompensation. (*Id.*) In this type of case, expert testimony is not necessary to establish causation. *See Ortiz*, 656 F.3d at 535. The fact that Plaintiff has it means that, contrary to Wolf's contention, he can proffer evidence of causation. The claim against Wolf must, therefore, proceed to trial.

Fellow Psychiatric Nurse Practitioner Deborah Mayo argues she had limited responsibility for and no knowledge of Plaintiff's missed clozapine doses. Her position is that she was only responsible for monitoring his bloodwork (patients on clozapine must have their blood drawn and tested weekly to ensure that it is safe to continue taking the drug). (ECF No. 187 at 7.) Plaintiff disputes this attempt to minimize her role and points to her designation as a "registered clozapine provider." (ECF No. 225 at 7.) Her job description included the following essential functions:

1. Performs medical examinations and evaluations, diagnoses, treatment, follow-up consultation and health education….
3. Supervises and/or coordinates the activities of patient care and/or support staff….
6. Prescribes psychiatric medication in conjunction with psychiatrist and facility protocols….
8. Facilitates communication between psychiatric services, programs, staff and patients.

(*Id.* at 7-8.) And Dr. Schoenecker testified "I don't know who else in her absence would be fulfilling" the duty to authorize Plaintiff's prescriptions and serve as his direct care provider. (*Id.* at 9.) This is in line with Psychiatric Nurse Practitioner Kim Wolf's explanation of her job duties (for the same position Mayo held). (*Id.* at 9-10) (stating that it was her duty to make sure patients got their medication).

But whatever role she is cast in, Mayo swears that she was never aware, between April 6 and June 28, 2016, that Plaintiff had missed any clozapine doses. The Supreme Court has held that "a prison official may be liable [for providing inadequate medical care to pretrial detainees] 'only if [she] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). But this standard does not require direct evidence of actual knowledge. *See Foelker v. Outagamie Cnty*, 394 F.3d 510, 513 (7th Cir. 2005). "Most cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). Here, Plaintiff presents enough circumstantial evidence for a jury to reasonably conclude that Mayo knew he was missing doses. For instance, on April 11 and 12, 2016, Plaintiff did not receive any clozapine because it was unavailable. (ECF No. 225 at 11.) A social worker documented this in his "Chart Notes" on April 12, 2016. (*Id.*) The next day, Mayo reviewed Plaintiff's labs and made an adjacent entry in the same notes. (ECF No. 195-48 at 13.) She did not, however, take any remedial action with respect to the missing clozapine. Her other entries in the chart indicate that she knew with relative precision just how often Plaintiff received and took his medication. (*Id.* at 8) ("Taking his Clozapine 25 mg 44% of the time.").

Assuming she had the requisite knowledge, Mayo asks the Court to view her in her best light and highlights the times she provided adequate care. Specifically, she notes that she placed Plaintiff on a titrated clozapine dose when he returned to the Jail in mid-July, scheduled a visit with a psychiatrist, set a task for a psychiatric social worker to ensure Plaintiff received his clozapine on August 3, 2016, and talked with Plaintiff about the importance of taking his medication on August 5, 2016. (ECF No. 225 at 18-19.) But even on a deliberate indifference claim, "an inmate need not show that he was 'literally ignored' to prevail." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (citation omitted). And the fact that a response "could have been worse" does not mean what occurred complied with the Fourteenth Amendment. Mayo may have acted more diligently during Plaintiff's second and third stays at the Jail, but that does not excuse or redeem her performance during his first period of incarceration. Tomorrow's laudable performance is no defense to today's objectively unreasonable behavior. While no rational jury could hold Mayo liable for the care provided after June 28, 2016, it could conclude that her actions

(or lack thereof) during the April 6 to June 28, 2016 period were objectively unreasonable. Thus, the claim against her survives summary judgment.

### III. The Negligence Claims Against Holifield, Wolf, and Mayo Must Also Proceed to Trial.

Alongside his Fourteenth Amendment claims, Plaintiff also brings negligence claims against five individual Defendants: Dr. Maureen White, Health Services Administrator Kayla McCullough, Director of Nursing Courtney Holifield, and Psychiatric Nurse Practitioners Kim Wolf and Deborah Mayo. Negligence comprises four elements: "'(1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury.'" *Martindale v. Ripp*, 629 N.W.2d 698, 707 (Wis. 2001) (quoting *Rockweit v. Senecal*, 541 N.W.2d 742, 747 (Wis. 1995)). A defendant whose actions do not exceed mere negligence cannot be found liable under the Fourteenth Amendment objective reasonableness standard. *Miranda*, 900 F.3d at 353. In other words, the fact that a jury could find that Defendants Holifield, Wolf, and Mayo violated the Fourteenth Amendment necessarily implies their exposure to negligence liability. That said, because questions of fact remain, especially with regards to causation, Plaintiff is not entitled to summary judgment on his negligence claims against Holifield or Wolf (he did not move for summary judgment against Mayo).

On the other hand, the record does not support negligence claims against Dr. White or McCullough. As part of his negligence claim, a plaintiff must show that a defendant "failed to exercise that standard of care usually exercised in similar situations by other members of the medical profession and thus breached the legal duty owed to the patient." *Johnson v. Misericordia Community Hospital*, 301 N.W.2d 156, 171 (Wis. 1981) (quoting *Mossey v. Mueller*, 218 N.W.2d 514, 516 (Wis. 1974)). As the foregoing analysis demonstrates, to the extent that Dr. White and McCullough had duties to Plaintiff, no reasonable jury could find those duties breached because both exercised appropriate care. Accordingly, Dr. White and McCullough are entitled to summary judgment on Plaintiff's negligence claim.

**CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the County Defendants' motion for summary judgment, ECF No. 176, is **DENIED**.

**IT IS FURTHER ORDERED** that the Armor Defendants' motion for summary judgment, ECF No. 182, is **GRANTED, in part,** and **DENIED, in part**. The motion is granted with respect to all claims against Dr. Maureen White and Kayla McCullough, and those Defendants are dismissed from the case. The motion is denied with respect to all other claims.

**IT IS FURTHER ORDERED** that Defendants Deborah Mayo's and Evanston Insurance Company's motion for summary judgment, ECF No. 186, is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Omar Wesley's motion for summary judgment, ECF No. 191, is **DENIED**.

Dated at Milwaukee, Wisconsin on November 7, 2022.

s/ *Brett H. Ludwig*
_____
BRETT H. LUDWIG
United States District Judge